*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CASEY K., | ) | |
| | ) | Supreme Court No. S-14985 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-10-00190 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 6837 – October 23, 2013 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Janella Combs Kamai, Johnson & Combs, PC, Kodiak, for Appellant. Laura Fox, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.      INTRODUCTION

A mother appeals the termination of her parental rights to her child.  She challenges the superior court's rulings that: (1) the child was a child in need of aid under

AS 47.10.011; (2) she failed to remedy the conduct that placed the child in need of aid; (3) the Office of Children's Services (OCS) made reasonable efforts to reunify the family; and (4) termination of her parental rights was in the child's best interests.[1] Because all of the superior court's rulings are supported by the record, we affirm the court's decision to terminate the mother's parental rights.

## II.    FACTS AND PROCEEDINGS

Cheyenne C.[2] was born to Casey K. and Cash C. in May 2005. Cash was violent toward Casey; at least once during their relationship he was convicted of violating a domestic violence protective order. Casey and Cash initially tried to raise Cheyenne together, but they split up in 2009 or 2010 and began sharing custody of Cheyenne on an informal, unscheduled basis. Neither parent established a stable home, and Cheyenne moved frequently among temporary living situations.

On September 9, 2010, OCS received a report of concern involving "[a]llegations of parental substance abuse and neglect" of Cheyenne, but the report was screened out because the family could not be located. Less than two weeks later, OCS received another report that was similar in nature. This time, OCS was able to locate the family and opened an investigation.

OCS social worker Cathy Gray conducted interviews with Cheyenne, Cash, and Casey as part of OCS's investigation. Gray reported that Cheyenne "stated her mother smokes [marijuana] in front of her." Casey admitted to occasionally smoking marijuana but denied ever using in front of her daughter. Gray requested that Cash, Casey, and Casey's boyfriend (with whom she was living at the time) complete

---

[1]    Although the superior court's decision also terminated the father's parental rights, he did not appeal; thus we address only the termination of the mother's parental rights.

[2]    Pseudonyms are used for the family to protect their privacy.

urinalysis (UA) tests, but none of them complied. OCS continued to receive reports that both parents were using drugs and that Cheyenne lacked a stable living situation.

In November 2010 Cash was arrested while Cheyenne was with him. The arresting officer contacted Casey's mother, Brenda, and one of Cash's friends dropped Cheyenne off at Brenda's house. Brenda tried to locate Casey but was unable to do so, and OCS was notified of Cash's arrest. Rather than take immediate legal custody of Cheyenne, OCS worked out a safety plan with Casey whereby Cheyenne would remain in Brenda's care and Casey would submit UA test results to verify her sobriety. Casey underwent four of the scheduled UAs: the first two did not produce a sample; the third tested positive for THC; and the fourth tested negative for all substances.

OCS took legal custody of Cheyenne on December 10, 2010, and Cheyenne remained in Brenda's care. At a contested probable cause hearing OCS explained why it had concluded that Cheyenne was a child in need of aid. OCS stated it was concerned about Casey's and Cash's drug use, their lack of stable housing, Casey's ongoing relationships with alleged drug dealers and perpetrators of domestic violence, and Cheyenne's possible exposure to domestic violence. OCS also asserted that Cheyenne had missed eight days of school by the third week of September while in Cash's and Casey's care, though it was unclear whether the missed days occurred when Cheyenne was with Cash or with Casey.

Brenda also testified that Cheyenne was exhibiting troubling behaviors. For example, soon after Cheyenne moved in with her, Brenda discovered that Cheyenne kept a bag under her bed with a change of clothes, stuffed animals, and food. Cheyenne referred to this bag as her "getaway bag" and explained to Brenda that she kept it in case she had to leave quickly, because when she was with Cash or Casey she sometimes had to leave places in the middle of the night and never knew whether she would return.

Brenda also noted that Cheyenne was hoarding items, such as half-eaten candies and scraps of paper.

The superior court found that probable cause existed to believe Cheyenne was a child in need of aid under AS 47.10.011(8)(b)(ii) (domestic violence) and AS 47.10.011(9) (neglect) and granted OCS temporary custody.[3] Cheyenne stayed in Brenda's care, where she has remained ever since.

In January 2011 OCS established a case plan requiring Casey to complete random UAs twice a week, obtain a substance abuse assessment and follow treatment recommendations, enroll in a domestic violence program and follow all recommendations, visit Cheyenne regularly, and maintain safe and stable housing. OCS agreed to pay for UA testing, substance abuse assessments, all necessary referrals, and transportation costs.

OCS case worker Brooke Antonich, who was assigned to the case in March 2011, did not have contact information for Casey and "pretty much just didn't know where she was or how to get a hold of her." In May 2011 Casey visited the OCS office and left a note with a phone number, but Casey did not answer when Antonich tried to call, and the voice mailbox was full. Casey visited the office again the following month and left another note with a different phone number, and Antonich was able to make contact after leaving several messages.

Casey was incarcerated on criminal impersonation charges for just over a week in June and July 2011. Soon after her release she met with Antonich to discuss her case plan for the first time. After the meeting Casey set up an appointment for a substance abuse evaluation with a treatment program, but OCS failed to timely submit

---

[3] The superior court also found probable cause under AS 47.10.011(10) (substance abuse), but this finding pertained only to Cash.

required collateral information to the assessor. Lacking the collateral information, the assessor relied exclusively on Casey's self-reporting during the evaluation and concluded that Casey did not need any substance abuse treatment. OCS sent the required collateral information about three weeks after the July 21, 2011 evaluation, but an updated evaluation was not available until March 2012, due in part to OCS's delay.

As part of Casey's case plan OCS arranged for Casey to visit Cheyenne at Brenda's house at least twice a week. Casey's visits were sporadic: a visitation log revealed that Casey was late or failed to show up for nearly two-thirds of the visits from September to November 2011, and Brenda testified this was typical behavior for Casey. Casey also failed to show up to two meetings with Antonich in October and November, and Antonich rarely knew where Casey was living. Casey's participation in the random UA testing program was equally minimal: Antonich testified that Casey only completed two or three UAs during OCS's involvement in the case over the span of two years even though random UA testing was always part of her case plan.

Casey was convicted of eluding a peace officer and incarcerated for over a month during December 2011 and January 2012. Casey made efforts to adhere to her case plan while incarcerated, completing a parenting class offered by the corrections system. However, Brenda did not bring Cheyenne to see Casey while she was incarcerated because of a mental health provider's recommendation and earlier discussions with Cash and Casey in which they all agreed that Cheyenne would never visit either parent in jail.

After her release Casey started attending domestic violence education classes, and Antonich noted "an improvement" in Casey's progress as her visits with Cheyenne became more consistent. Casey met with Antonich to discuss her case plan again in March 2012, and Antonich updated the case plan. Casey informed Antonich that she had yet to secure an apartment for herself, but she was staying with her father

and intended to move into her own apartment soon. Antonich never heard anything further about the apartment, however, and she was unable to locate Casey at her father's house or elsewhere. Casey spoke with Antonich again in April, but she was unable to provide Antonich with her contact information. Antonich also expressed concern that although Casey had nearly completed the domestic violence education classes, she continued to associate with past partners who had been accused of committing domestic violence.

Casey was again arrested and incarcerated in April 2012, this time for attempting to falsify a UA by using a device containing another person's urine. Casey was convicted of tampering with physical evidence and sentenced to two years' imprisonment, with one year suspended. Casey was housed in segregation in the correctional facility because she allegedly attempted to escape from a pre-trial detention facility. As a result, Casey was unable to take advantage of the substance abuse, domestic violence, anger management, and parenting programs offered by the corrections system. According to her probation officer, Casey was also "written up . . . for various incidents" of misconduct while incarcerated. At the time of the termination trial, Casey was still incarcerated and housed in segregation, and the escape allegations were still under investigation.

Although Cheyenne did not visit Casey at the jail, Casey saw her daughter when she was released on a temporary furlough to attend a family funeral in July. That visit went well, and Casey was very attentive to Cheyenne. Casey also wrote letters to Cheyenne from prison and spoke to her by phone on one occasion. But phone communication had to be arranged by OCS because Casey was housed in segregation, and it is unclear whether Casey requested OCS to arrange for additional phone visitation.

The superior court held a termination trial in November 2012, nearly two years after OCS took legal custody of Cheyenne. Antonich testified that it would be in

Cheyenne's best interests to be freed for adoption by her grandparents. Antonich expressed concern that it would take at least six to eight months after Casey's release from prison before Casey and Cheyenne could be reunified, and she did not think it was appropriate "to delay [Cheyenne's] permanency any longer."

Casey testified to why her parental rights should not be terminated. Casey stated that she expected to be released in December, at which time she intended to move in with her family, go back to work, obtain a college degree, and follow her case plan so she could regain custody. When asked whether her parental rights should be terminated, Casey responded, "I know that I wasn't as serious as I should have been before, and I — it's my own fault for not doing all of it like I should have. But I believe I deserve another chance, at least another six months to get everything done." Casey also stated she believed it would take her no more than six months to achieve stability.

Brenda testified that Cheyenne knew her and her husband as her primary caregivers, and she agreed that it would not be in Cheyenne's best interests to "stay in limbo" by putting the termination decision off for another year or so while Casey and Cash worked on their case plans. Brenda acknowledged that the termination decision was "really, really hard" and stated that she fully intended to encourage Cheyenne to maintain relationships with her birth parents.

At the conclusion of the termination trial Superior Court Judge Eric Smith issued oral findings, which were followed the next month by a written order terminating Casey's parental rights. The superior court found by clear and convincing evidence that Cheyenne was a child in need of aid pursuant to AS 47.10.011(1) (abandonment), (9) (neglect), and (10) (substance abuse).[4] The court found that Casey had done "very little

---

[4]    The superior court also found Cheyenne to be a child in need of aid under AS 47.10.011(2) (incarceration), but this finding pertained only to Cash.

on her case plan"; that "there was ample and credible testimony of neglect of [Cheyenne] while she was living with her folks due to the drug use and the lifestyles that were induced by the drug use, as well as the fact that both parents have been . . . unavailable to [Cheyenne] because they were incarcerated due to their drug use"; and that Casey had an "ongoing substance abuse addiction."

The superior court also found by clear and convincing evidence that Casey had not "remedied the conduct or conditions in the home that put the child at substantial risk of harm," and that OCS "made timely and reasonable efforts as required by AS 47.10.086 to effectuate reunification between the parents and the child . . . ." Finally, the superior court found by a preponderance of the evidence that termination of Casey's parental rights was in Cheyenne's best interests.

Casey appeals from the termination order.

## III.  STANDARD OF REVIEW

In a child in need of aid (CINA) termination proceeding we review a superior court's factual findings for clear error.[5] Factual findings "are clearly erroneous if review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[6] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[7] "Whether a child is in need of aid and whether the parent failed

---

[5]  *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011).

[6]  *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (internal quotation marks omitted).

[7]  *Id.* (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)) (internal quotation marks (continued...)

to remedy the 'conduct or the conditions that placed the child at substantial risk' of harm are factual findings reviewed for clear error."[8] Whether OCS has made reasonable reunification efforts is a mixed question of law and fact.[9] Best interests findings are factual findings reviewed for clear error.[10] Whether the superior court's factual findings satisfy the CINA statutes is a question of law that we review de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[11]

## IV. DISCUSSION

In order to terminate parental rights under AS 47.10.088, a superior court must find by clear and convincing evidence that: (1) a child is in need of aid under at least one of the subsections listed in AS 47.10.011; (2) the parent has not remedied the conduct or conditions that caused the child to be in need of aid or that returning the child to the parent would put the child at substantial risk of physical or mental injury; and (3) OCS has made reasonable efforts to provide family support services to the child and to the parent.[12] The court must also find by a preponderance of the evidence that

---

[7](...continued)
omitted).

[8]     *Id.* (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

[9]     *Sherman B. v. State, Dep't of Health and Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[10]     *Id.*

[11]     *J.S. v. State*, 50 P.3d 388, 391 (Alaska 2002).

[12]     AS 47.10.088(a).

termination is in the child's best interests.[13]

## A. The Superior Court Did Not Err In Finding That Cheyenne Was A Child In Need Of Aid.

In order to terminate parental rights, the superior court must find by clear and convincing evidence that a child is in need of aid under at least one subsection of AS 47.10.011.[14] Alaska Statute 47.10.011(10) provides that the superior court may find a child is in need of aid if "the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child." We have explained that the substantial-risk-of-harm requirement is satisfied where a parent's addictions are "at least partially responsible for his current and past incarcerations, and . . . his frequent and prolonged absences while incarcerated

---

[13]     AS 47.10.088(c); CINA Rule 18(c)(3).

[14]     AS 47.10.088(a). Casey does not appeal the superior court's finding that Cheyenne was a child in need of aid under AS 47.10.011(9) (neglect) or (10) (substance abuse); she appeals only the court's finding that she abandoned Cheyenne under AS 47.10.011(1). But only one statutory basis is required for a CINA finding. *See G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 67 P.3d 648, 651 (Alaska 2003) (affirming superior court's finding that child was in need of aid under AS 47.10.011(1) and declining to review the court's findings under AS 47.10.011(2) or (9) or AS 25.23.180(c)(3), "since one statutory basis is sufficient for finding a child to be in need of aid in a termination proceeding"). Casey has therefore waived any challenge to the superior court's finding that Cheyenne was a child in need of aid. *See Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 618 (Alaska 2007) ("Because either finding [that child was in need of aid] alone would support the termination order and because Alyssa does not challenge the court's finding of abandonment, her challenge to the mental illness finding has no impact on the outcome of the case."). Nevertheless, we address the merits of the superior court's substance-abuse finding because it informs our analysis of whether Casey remedied her conduct within a reasonable time and whether OCS made reasonable efforts to reunify Casey with Cheyenne.

substantially impair his ability to parent."[15]

Here, there was abundant evidence in the record of Casey's substance abuse problems. Casey repeatedly failed to participate in the UA testing program required by her case plan; Antonich testified that Casey only completed two or three UAs during OCS's nearly two-year involvement in the case even though random UA testing was always part of her case plan.[16] These missed UAs counted against Casey as failed UAs. Moreover, as late as several months before the termination trial, Casey attempted to falsify a UA. Casey's substance abuse directly resulted in her current incarceration, which itself prevented Casey from having in-person contact with her daughter. The superior court did not clearly err in finding that Cheyenne was a child in need of aid under AS 47.10.011(10) and, as we explained above, Casey does not contest this finding on appeal.

Because we affirm the superior court's finding that Casey's substance abuse issues placed her child in need of aid under AS 47.10.011(10), we need not consider whether the superior court's findings that Cheyenne was a child in need of aid under the other subsections of AS 47.10.011 were clearly erroneous.[17]

---

[15] *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 777 (Alaska 2012) (quoting *Stanley B. v. State, DFYS*, 93 P.3d 403, 407 (Alaska 2004)) (internal quotation marks omitted).

[16] OCS indicated in the initial emergency petition that Casey submitted to four UAs: one tested clean, one tested positive for THC, and two did not produce a sufficient sample. It is unclear whether Antonich's statement about the number of UAs Casey completed took into account only those UAs Casey completed after her case plan was created or whether Antonich did not include those UAs that did not produce a sample. Either way, the record demonstrates that Casey's participation in the random UA testing program was minimal.

[17] *See G.C.*, 67 P.3d at 651.

**B.**     **The Superior Court Did Not Err In Finding That Casey Did Not Remedy Her Substance Abuse Issues In A Reasonable Amount Of Time.**

In order to terminate parental rights, the superior court must find by clear and convincing evidence that the parent has failed, within a reasonable time, to remedy the conduct that placed the child at substantial risk of harm.[18] In making this determination, the court may consider "any fact relating to the best interests of the child," including: (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent.[19] "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[20]

In finding there was clear and convincing evidence that Casey had not remedied the conduct or conditions in the home that put Cheyenne at substantial risk of harm, the superior court cited Casey's failure to complete substance abuse treatment, her failure to comply with her probation program, and her lack of "concrete plans" following her release from prison. Casey argues she made "substantial progress" toward remedying her conduct and, but for OCS's failure to provide the collateral information for her substance abuse evaluation, she would have done so within a reasonable amount of time. Casey acknowledges that she initially struggled to follow her case plan, but

---

[18]     AS 47.10.088(a)(2); *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 431 (Alaska 2012).

[19]     AS 47.10.088(b).

[20]     *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003).

argues that "[o]nce she engaged" she "moved forward with all aspects of her case plan[]." OCS responds that even if OCS were at fault for some delay, Casey still had a reasonable opportunity to remedy her conduct. OCS contends that "[w]ere it not for Casey's seven-month failure to engage, sporadic contacts with OCS, continued pattern of poor decision-making, and commission of criminal acts leading to incarceration and segregation, she would have had ample time to complete substance abuse treatment and demonstrate sobriety within the two years preceding the termination trial."

Casey exaggerates the extent to which she complied with her case plan. As described above, Casey made no efforts to participate in her case plan or remedy her conduct for the first seven months after OCS took custody of Cheyenne, and Antonich testified that she was unable to get in contact with Casey for a four-month period when she was first assigned to the case. Casey completed only two to four UAs during the entire period of OCS's involvement even though random UA testing was always required by her case plan. All of her missed or incomplete UAs were properly considered failed UAs. And although Casey's progress improved in early 2012, she was again incarcerated in April 2012, this time for conduct directly related to her substance addictions: Casey attempted to falsify her UA test result by substituting another person's urine for her own. At the time of the termination trial, Casey was still incarcerated, housed in segregation, and had an unknown release date.

Casey properly notes that OCS's failure to timely provide required collateral information to the substance abuse treatment assessor prevented her from receiving an accurate substance abuse evaluation for eight months. Although this failure may have made it more difficult for Casey to receive immediate treatment for her substance abuse issues, it did not preclude her from remedying her substance abuse problems within a reasonable time. Cheyenne had been in OCS's custody for nearly two years at the time of the parental rights termination trial, and yet Casey remained

incarcerated with an unknown release date. Moreover, Casey received the accurate substance abuse evaluation in March 2012, yet she was incarcerated for tampering with a UA device a month later.[21]

The record suggests that although Casey made some progress toward remedying her conduct for a two-month period in the spring of 2012, her overall efforts over the nearly two-year period of OCS's involvement were minimal and sporadic. The superior court did not clearly err in finding that Casey failed to remedy her conduct in a reasonable time.

## C. The Superior Court Did Not Err In Finding That OCS Made Reasonable Efforts To Reunify Casey With Cheyenne.

Casey challenges the superior court's finding that OCS made reasonable efforts to reunify her with Cheyenne, arguing there is insufficient evidence in the record to support this finding. Before terminating parental rights, the court must find by clear and convincing evidence that OCS has made reasonable efforts to effectuate reunification between the parent and the child.[22] Alaska Statute 47.10.086 requires OCS to "make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement."[23] As part of these "reasonable efforts," OCS must identify, "actively offer," and refer the parent to family support services that will

---

[21]    We also note that the treatment assessor's initial assessment of Casey was based exclusively on information which Casey provided. Thus, to the extent the provider erroneously concluded that Casey did not need treatment, this error was presumably caused by Casey's own misstatements in her self-reporting.

[22]    AS 47.10.088(a)(3).

[23]    AS 47.10.086(a).

assist him or her in remedying the conduct or conditions in the home that made the child a child in need of aid.[24] OCS must also document its actions.[25] When making determinations under AS 47.10.086, "the primary consideration is the child's best interests."[26]

"The efforts that OCS makes must be reasonable but need not be perfect."[27] We have recognized that OCS maintains "some discretion in determining what efforts to pursue and whether the timing is reasonable."[28] Additionally, "[a] parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide."[29]

The superior court found that OCS's efforts included the development of an initial safety plan; the development of case plans; referrals for UAs and substance abuse assessments; provision of funds for UAs and assessments; the establishment of an "open and liberal" visitation schedule; and the provision of programs by the Department of Corrections (DOC) while Casey was incarcerated. The court further found that OCS "provided extensive services for the child and there was ongoing contact between [OCS] and the parents including phone calls, attempted phone calls to return the parents' calls

---

[24] *Id.*

[25] *Id.*

[26] AS 47.10.086(f).

[27] *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[28] *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 338 (Alaska 2011) (citing *Jeff A.C., Jr. v. State*, 117 P.3d 697, 706 (Alaska 2005)).

[29] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 432 (Alaska 2012) (quoting *Sean B.*, 251 P.3d at 338) (internal quotation marks omitted).

and a variety of meetings to address the status of the case and the needs of the parents and child." Based on this evidence, the superior court concluded that there was "clear and convincing evidence that [OCS] made timely and reasonable efforts as required by AS 47.10.086 to effectuate reunification between the parents and the child . . . ."

As discussed above and as Casey stresses in her appellate brief, OCS's efforts were not perfect: OCS failed to timely provide the required collateral information for her substance abuse evaluation (OCS's delay was three weeks). This three-week oversight resulted in Casey having to wait for eight months to receive an accurate substance abuse evaluation. But the reasonableness of OCS's efforts must be viewed "in light of the entire history of services" provided,[30] and we have repeatedly held that a brief lapse in OCS's provision of services does not foreclose a finding that OCS made reasonable efforts toward reunification.[31] Thus, OCS's delay in providing the collateral information to the substance abuse evaluators did not in itself render OCS's efforts unreasonable. And given OCS's other efforts throughout the history of services, which included the creation of a safety plan, the creation of a case plan and at least one update of that case plan, the provision of liberal visitation with Cheyenne, a mental health

---

[30] *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003).

[31] *See Roland L. v. State, Office of Children's Servs.*, 206 P.3d 453, 456 (Alaska 2009) (holding that even under the higher "active efforts" burden required in Indian Child Welfare Act (ICWA) cases, the fact that OCS failed to make efforts during three of the 26 months it was involved in the case was not determinative); *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 765 (Alaska 2009) (holding that OCS made "active efforts" as required by ICWA, even where OCS's efforts temporarily declined when father was incarcerated).

assessment for Cheyenne,[32] frequent attempts to contact Casey, referrals for services, the provision of funds, and DOC's provision of services while Casey was incarcerated, the superior court did not err in concluding that OCS made the requisite "reasonable efforts."

Casey also argues that OCS "did not identify and provide any services while [Casey] was incarcerated." Casey asserts that OCS's "failure to work with the correctional facility falls far beneath the appropriate standards that are expected of the Department to meet its burden in preventing the ultimate break up of a family."

When a parent is incarcerated, DOC rather than OCS has the primary responsibility of providing services.[33] Although a parent's incarceration does not relieve OCS of its duty to make reasonable efforts, it affects the scope of that duty.[34] In the context of an ICWA case where OCS bears the higher burden of making "active efforts" to promote reunification, we have held:

> A parent's incarceration significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement. While neither incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty . . . to make active remedial efforts, the practical circumstances surrounding a parent's incarceration — the difficulty of providing resources to inmates generally, the

---

[32]     Casey notes that OCS "only obtained one mental health evaluation" of Cheyenne and argues that "[n]o other assessments or evaluations were completed to show that any contact between mother and child should be restricted[.]" But Casey does not provide any grounds why more than one evaluation was needed. Moreover, OCS never attempted to restrict contact between Casey and Cheyenne; the case plan provided for liberal visitation.

[33]     *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 56 (Alaska 2003).

[34]     *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

unavailability of specific resources, and the length of incarceration — may have a direct bearing on what active remedial efforts are possible.[35]

Contrary to Casey's argument, OCS did identify and make available services while Casey was incarcerated. Casey completed a parenting program offered by DOC when she was first incarcerated, but she was unable to take advantage of this or other programs during her most recent incarceration because she was housed in segregation due to her alleged escape attempt.[36] Thus, the "practical circumstances" of Casey's situation had a "direct bearing" on the services OCS and DOC could offer her.[37] Cheyenne did not visit Casey while she was incarcerated, but this lack of visitation was again due to the parties' consensus that it would be unhealthy for Cheyenne to visit the jail. And although OCS only arranged one phone call between Casey and Cheyenne while Casey was housed in segregation, the parties disputed whether Casey requested increased phone contact.

Finally, Casey's own lack of participation in the services offered by OCS supports the superior court's finding that OCS made reasonable efforts toward reunification.[38] As described above, Casey consistently failed to follow her case plan

---

[35]   *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (internal quotation marks and alterations omitted); *see Barbara P.*, 234 P.3d at 1262 (applying *A.A.* to CINA "reasonable efforts" determination).

[36]   *Cf. Martin N.*, 79 P.3d at 56 (rejecting parent's argument that OCS failed to make reasonable efforts, where parent's "maximum security status — which resulted from [his] own actions while in prison — precluded him from taking further classes" offered by the prison).

[37]   *See A.A.*, 982 P.2d at 261.

[38]   *See Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 432 (Alaska 2012); *Erica A. v. State, Dep't of Health & Soc.* (continued...)

throughout the duration of OCS's involvement. Given the entire history of the services offered by OCS and Casey's general lack of participation, we hold that the superior court did not clearly err in concluding that OCS made reasonable efforts to reunify Casey with Cheyenne.

**D.  The Superior Court Did Not Err In Finding That Termination Of Casey's Parental Rights Was In Cheyenne's Best Interests.**

Before parental rights may be terminated, the superior court must find by a preponderance of the evidence that termination is in the child's best interests.[39] In making this determination, the superior court may consider the same factors it may consider to determine whether a parent remedied her conduct within a reasonable time, set forth above.[40] The court also may consider the presence or lack of favorable present placements.[41]

The superior court ruled that terminating Casey's parental rights would be in Cheyenne's best interests. The court found that Cheyenne needed permanency, which Casey was unable to provide to her; that there was no evidence that Casey was going to change her behavior, and "without change, the best predictor of future behavior is past behavior"; that once released, it would take Casey up to two years to prove her sobriety and stability; and that it was not in Cheyenne's best interests "to give [Casey] an unlimited amount of time to remedy the harm [she] pose[d]" to Cheyenne.

Casey argues that "[c]onsidering the bond between mother and child, the

_____

[38](...continued)
*Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 8 (Alaska 2003).

[39]  AS 47.10.088(c); CINA Rule 18(c)(3).

[40]  AS 47.10.088(b).

[41]  *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 339 (Alaska 2011).

efforts made by [Casey] that were impeded by the Department[,] and the temporal proximity of a near completion of [Casey's] case plan, there was insufficient evidence to show that the best interests of Cheyenne were met with termination of her mother's rights."

Casey correctly asserts there was evidence that she and Cheyenne shared a bond: at the probable cause hearing in January 2011, Brenda testified that, before her recent troubles, Casey had "always been a good mom," and Brenda also acknowledged at the termination trial that Cheyenne had an attachment to Casey. But Casey again mischaracterizes the extent to which she complied with her case plan and the extent to which OCS's failure to provide the collateral information for her substance abuse evaluation impeded her progress. As described above, Casey failed to participate in or even discuss her case plan for the first seven months of OCS's involvement, and her participation remained sporadic and minimal for the next six or seven months. Casey complied with some aspects of her case plan for two months in the spring of 2012, but she was incarcerated soon after. Casey stated that she thought she would be released in December 2012, just a month after the termination trial, and once released it would take her no more than six months to achieve stability. But Casey's actual release date was unknown at the time of the trial because she was facing pending escape charges. And Antonich testified that it would take at least six to eight months of stability — including "clean UAs, working a case plan, steady employment, housing, safe housing, stable housing" — before Cheyenne and Casey could be reunified. Notwithstanding the evidence of Casey's bond with Cheyenne,[42] it was appropriate for the superior court to emphasize Cheyenne's need for permanency and stability in determining whether

---

[42] Brenda also testified that she intended to encourage Cheyenne to maintain relationships with her birth parents, indicating that the bond between Cheyenne and Casey will not necessarily be severed by the termination of Casey's parental rights.

termination was in her best interests.[43] Casey's incarceration, Casey's past behavior, and Antonich's time-frame estimation all supported the court's conclusion that Casey would be unable to meet Cheyenne's needs.

Casey also argues there was "limited to no evidence presented concerning the harm Cheyenne suffered," and "little history to show any harm" committed by Casey. But there was evidence in the record that Cheyenne was "way behind" in school and in danger of being held back a grade "because she had missed so much [school]" while in Casey's and Cash's custody; that Cheyenne maintained a "getaway bag" because she was accustomed to hurriedly having to leave places where she would stay with her parents; that Cheyenne exhibited "hoarding behavior"; and that Casey's failure to adhere to the visitation schedule upset Cheyenne. The record thus supported the superior court's finding that Casey had harmed Cheyenne in the past, and this past behavior supported the court's finding that termination of Casey's parental rights would be in Cheyenne's best interests.

Finally, the presence of Brenda as a favorable placement supported the superior court's conclusion that termination was in Cheyenne's best interests.[44] Antonich

---

[43] *See Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263-64 (Alaska 2010) (holding that a superior court "properly considered the children's need for permanency, a crucial need for young children," in evaluating the best interests of the child in a termination proceeding); *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850-51 (Alaska 2009) (approving of a superior court's consideration of "the children's need for stability and permanency" in evaluating the best interests of the children).

[44] *See Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 434 (Alaska 2012) ("[T]he fact that a child has bonded with her foster parent can be a factor in considering whether it is in the child's best interests to terminate a parent's rights." (quoting *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008))) (internal quotation marks omitted).

testified that Cheyenne was "thriving" in Brenda's home and that it was OCS's position that Cheyenne's long-term goal should be adoption by her grandparents. Brenda testified that Cheyenne viewed her and her husband as her primary caretakers and that she and her husband were "100 percent" committed to Cheyenne. Brenda further stated that she and her husband were able to provide Cheyenne with stability: notwithstanding her earlier problems, Cheyenne was excelling in school at the time of the termination trial, and she had developed a routine with Brenda and her husband. The superior court did not clearly err in concluding that this evidence, together with the evidence of Casey's conduct, established that termination was in Cheyenne's best interests.

## V. CONCLUSION

For the reasons explained above, we AFFIRM the superior court in all respects.