NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KENT P.,<br><br>    Appellant,<br><br> v.<br><br>STATE OF ALASKA, DIVISION OF<br>HEALTH & SOCIAL SERVICES,<br>OFFICE OF CHILDREN'S SERVICES,<br><br>    Appellee. | Supreme Court No. S-16238<br><br>Superior Court No. 3AN-14-00067 CN<br><br>MEMORANDUM OPINION<br>AND JUDGMENT[*]<br><br>No. 1640 – July 5, 2017 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant. Joanne M. Grace, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

The trial court terminated a father's parental rights to his daughter. The father appeals, arguing that the trial court clearly erred in finding that his daughter was a child in need of aid under AS 47.10.011(10) (parental substance abuse). We affirm the trial court's termination of his parental rights.

---

[*] Entered under Alaska Appellate Rule 214.

## II.    FACTS AND PROCEEDINGS

### A.    OCS Involvement

Allison was born in 2008 to her parents Kent and Amy.[1]  Soon after she was born her mother stabbed Kent in the face with a broken plate while Allison was present.  Amy was often violent, particularly when under the influence of alcohol.  Kent and Allison stayed with her until 2010.  Allison then resided primarily with Kent at his home, but Kent continued to see Amy, and Allison continued to spend time with her.

The Office of Children's Services (OCS) became involved with Kent, Amy, and Allison in 2013 after receiving  reports of domestic violence, drug use, and sexual abuse that arose in a custody dispute between Amy and Kent over Allison.  Kent agreed in November 2013 to participate in a safety plan for Allison, which prevented him from facilitating contact between Allison and Amy.  Kent also began a series of urinalysis (UA) tests at OCS's request to determine whether he was using drugs.  He failed to attend a number of his UA appointments and had three positive test results for marijuana when he did provide samples.

OCS filed a petition for temporary custody of Allison in February 2014, alleging that Kent was violating his safety plan by allowing Amy to visit Allison in their home.  The trial court found probable cause to believe that Allison was a child in need of aid and granted OCS temporary custody.  OCS developed case plans for Amy and Kent that required Kent to meet with his case worker "to help enhance protective capacities" and required both to participate in substance abuse assessments.

Kent admitted at his substance abuse assessment that he used marijuana, but denied that he had a problem.  He had a number of clean UAs over several months.  But in May, after OCS requested hair follicle testing to provide further information about

---

[1]    We use pseudonyms to protect the family's privacy.

whether he was using drugs, he appeared at the appointment completely shaven, making it impossible to provide a sample for testing. Amy tested positive for methamphetamine on a hair follicle test taken that same day.

In August 2014 Kent and Amy stipulated that Allison was a child in need of aid under AS 47.10.011(10), agreeing that their substance abuse impaired their ability to parent Allison. The court adjudicated Allison a child in need of aid pursuant to the stipulation.

Kent continued to participate in random UAs through the end of 2014. Most of the results were clean, although he failed to appear for several appointments. OCS permitted him to have unsupervised home visits with Allison on Thanksgiving and Christmas. But he tested positive for methamphetamine in December. OCS grew concerned that this new positive test indicated that he was seeing Amy again because she had once more tested positive for methamphetamine about two weeks earlier. OCS discontinued Kent's home visits with Allison and required him to provide three months of clean UAs before the home visits would resume.

In February 2015 OCS petitioned to terminate Kent's and Amy's parental rights to Allison. The petition alleged that termination was appropriate based upon multiple sections of AS 47.10.011: (1) (abandonment), (6) (risk of physical harm), (8) (mental injury), (9) (neglect), and (10) (substance abuse).

Kent continued to intermittently attend his UAs, but he was not able to show three months of clean test results and was not able to regain unsupervised visitation with Allison. He tested positive for marijuana repeatedly. He also had three test results showing positives for hydrocodone and another for methamphetamine.

OCS again referred Kent to a substance abuse treatment program, which Kent appears to have successfully completed. But he had another UA showing that he had consumed methamphetamine in November 2015, shortly before the termination trial

began.  In December he arrived for a hair follicle testing appointment but refused to participate in the test.  That same day his UA result was positive for hydrocodone.

**B.    The Termination Trial**

The trial court held a two-day trial on the termination petition in December 2015.[2]  OCS called Kent as its first witness; his lawyer also called him as a witness at the end of the trial.  He spoke about his relationship with Allison and Amy — particularly Amy's violence and substance abuse — and testified that his relationship with Amy was over.   He admitted that he used marijuana but denied that he had ever used methamphetamine, blaming the positive UA results chiefly on a couch in his home that had once belonged to Amy.  Kent testified that his hydrocodone positives were from a prescription that he had received for dental procedures.  When asked about his refusal to participate in the hair follicle tests, Kent responded that he wanted to avoid potential double-positives, where a single instance of drug use might yield a positive UA one day and a positive hair follicle test several weeks later.

Allison's therapist testified that Allison had post-traumatic stress disorder (PTSD) stemming from her exposure to domestic violence between Kent and Amy.  She said that Allison would have difficulty making the transition from her present foster home back into her father's custody.  Kent had testified that Allison did not show any sign of PTSD or any other emotional problem when she was with him and that he believed any such problems were due to her removal from his home by OCS.  The therapist felt that Kent's opinion was unrealistic.  She testified that Allison would require a consistent caregiving regimen if her prognosis was to improve.

---

²    In addition to Kent's and Amy's rights to Allison, the trial also involved Amy's rights to her son, Allison's half-brother.

Although there was testimony that Kent understood Allison's needs and consistently participated in family therapy, Allison's OCS caseworker testified that Kent often behaved inappropriately toward Allison. She stated that he would ask Allison inappropriate "ultimatum" questions, and made an inappropriate "false promise" implying that she would be coming home.

Two other OCS workers testified to their frustration with Kent's repeated positive drug tests. One spoke about Kent's inability to stop using marijuana even after his visitation with Allison was restricted. Another explained that it was traumatic for Allison when Kent's visits were suddenly restricted after his positive UAs and that the impact was worse because his earlier progress had raised her expectations that she would be able to return to him.

At the end of trial the court terminated Amy's parental rights under the substance abuse, domestic violence, and abandonment provisions of the CINA statute.[3] The court deemed Kent's a closer case and deferred its decision as to him so that it could more thoroughly review the many exhibits.

The court issued a decision terminating Kent's parental rights to Allison about a week later. It declined to find that Kent had made Allison a child in need of aid because of mental injury or neglect, and found that OCS had "presented no proof that [Kent] and [Amy] continue[d] in a relationship together."

But the court found that OCS had proven by clear and convincing evidence that Allison was a child in need of aid under AS 47.10.011(10), the substance abuse provision. The court summarized Kent's history of drug use, stating that he had twice undergone treatment but had continued to have no-shows or positive UAs for marijuana

---

[3]     *See* AS 47.10.011(1), (8), (10).

and methamphetamine, even after OCS took custody of Allison and specifically required that he maintain clean UAs.

The court focused on Allison's PTSD diagnosis. It described the origins and effect of Allison's PTSD, how it likely arose from witnessing Amy's violence, how Allison now had nightmares and lacked coping skills, and how she feared being taken away from her foster mother. The court noted that Kent was "unwilling to accept that [Allison's] problems stem from the domestic violence she has witnessed in her life, and believes that all of her problems relate to her removal from his care." Although the court acknowledged that "there was testimony that [Kent] does understand [Allison's] needs," and that Kent had largely been cooperative with OCS on programs not related to drug abuse, it found that Kent's continued use of "illegal and unsafe substances" outweighed any progress that he had made on other issues. It therefore concluded that "returning [Allison] to [Kent] at this time would place her at risk that [her] symptoms would re-occur, particularly in light of his substance abuse problems over the past two years." The court finally found that Kent had failed to remedy this conduct, that OCS had made reasonable efforts to provide support services to the family, and that termination was in Allison's best interests.

Kent appealed, and we remanded to the trial court to clarify its reasoning under AS 47.10.011(10), which requires a finding that "the parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."[4] On remand the trial court noted again that Allison has PTSD, that "[s]he demonstrates avoidant behaviors and hypervigilance," that "[s]he has difficulties

---

[4]     *K.P.(Father) v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-16238 (Alaska Supreme Court Order, Oct. 14, 2016).

with transitions to a greater degree than other children her age," and that Allison's issues made her need for permanency "more critical" than for other children. The court reiterated its findings on Kent's drug abuse and found that, without sobriety, Kent "cannot provide [Allison] with the stability and permanency she needs."

Kent appeals once more.

## III. STANDARD OF REVIEW

Whether a child is in need of aid is a factual determination, which we review for clear error.[5] A trial court's factual findings "are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[6]

## IV. DISCUSSION

Kent argues that the trial court's findings regarding Allison's child-in-need-of-aid status "are conclusory and are not supported by the record." He argues that the court never explained how Allison's PTSD-related needs were "related to [his] substance abuse" and never "cited any harm or real risk of harm that was established by the evidence." We disagree, and affirm the judgment of the trial court.

The evidence established that Kent had a problem with "addictive or habitual use of an intoxicant," particularly marijuana, but also methamphetamine; that he attempted to conceal his use from OCS; and that he never owned up to it, even at trial. Over two years Kent had three UAs that were positive for methamphetamine, fourteen for marijuana, at least fifty no-show appointments — which were counted as failed

---

**5** *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013) (citations omitted).

**6** *Id.* at 949 (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 269-70 (Alaska 2011)).

UAs[7] — and twice refused to offer samples for hair follicle tests, going so far as to appear for one appointment completely shaven. At his termination hearing he offered explanations for his positive test results that the trial court found incredible.

Kent contends that there was no evidence of "any harm or real risk of harm" to Allison as a result of his drug use, but the evidence presented adequately supports the trial court's conclusion. Allison had special needs: she had PTSD and required a carefully structured environment that would pose a challenge for any parent. The trial court accordingly found that unless Kent was sober he could not meet her special needs. The court also heard evidence that, not only did Kent not understand Allison's needs in this regard, but that he maintained a methamphetamine habit virtually up to the day of trial, a habit which he refused to acknowledge even as the trial took place. Finally Kent himself had stipulated that Allison was a child in need of aid under the substance abuse subsection of AS 47.10.011. It was thus not clear error for the trial court to find that Kent's unacknowledged, ongoing methamphetamine habit (along with his other admitted drug use) substantially impaired his ability to care for his special-needs daughter. As we stated in *Barbara P.*, "OCS was not obligated to leave [a child] with or return [her] to [a parent] and wait to accumulate evidence of parenting problems based on [the parent's] admitted drug use, thereby risking actual harm to the child, before requesting a finding that [the child] is . . . in need of aid."[8]

---

[7] *See Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 644 (Alaska 2013) (noting that OCS counted one parent's missed UAs as failed UAs, and that this evidence could support a CINA finding under AS 47.10.011(10)).

[8] *Barbara P. v. State, Dep't of Health & Soc. Servs.,* 234 P.3d 1245, 1259 (Alaska 2010) (citing *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 54 (Alaska 2003)).

We therefore conclude that the trial court did not clearly err in finding that Allison was a child in need of aid under AS 47.10.011(10).

## V. CONCLUSION

The decision of the trial court is AFFIRMED.