NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CHARLOTTE L., ) | Supreme Court No. S-17032 |
| Appellant, ) | |
| ) | Superior Court Nos. 4BE-15-00019/ |
| v. ) | 00020/00041 CN |
| ) | |
| STATE OF ALASKA, DEPARTMENT ) | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, ) | AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, ) | |
| ) | No. 1707 – December 26, 2018 |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Dwayne W. McConnell, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Shelley J. White, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I. INTRODUCTION

A mother appeals a superior court ruling approving the Office of Children's Services' (OCS) removal of her three children from foster care with their paternal

---

\* Entered under Alaska Appellate Rule 214.

grandparents. She first challenges the court's finding that she failed to show by clear and convincing evidence that the removal was contrary to the children's best interests. We conclude that the superior court's finding was not clearly erroneous. She also contends — although she did not make this argument to the superior court — that the court failed to make additional findings arguably required by the Indian Child Welfare Act[1] (ICWA). We conclude that, in the context of this case, the superior court did not err. We therefore affirm its decision.

## II.    FACTS AND PROCEEDINGS

### A.    Family History And Involvement With OCS

Charlotte L. and Jack F.[2] are parents to three Indian children within the meaning of ICWA.[3] Until recently the entire family resided in Tuntutuliak. OCS's history with the children dates to 2004, generally involving reports of neglect and physical abuse accompanied by the parents' intoxication.

In 2015 OCS filed petitions to adjudicate the parents' then-four children as in need of aid and remove them from Charlotte and Jack's custody after one of the children was found wandering the Anchorage airport; Jack was located nearby, heavily intoxicated and unable to care for the child. OCS filed an emergency petition in Anchorage for the child it had taken into emergency custody at the airport.[4] OCS filed

---

[1]    25 U.S.C. §§ 1901-1963 (2012). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[2]    Pseudonyms are used to protect the family members' privacy.

[3]    *See* 25 U.S.C. § 1903(4) (defining "Indian child" for ICWA purposes).

[4]    *See* AS 47.10.142 (authorizing OCS to take emergency custody of child (continued...)

a non-emergency petition in Bethel for custody of the other children in Tuntutuliak.[5] The superior court later adjudicated all of the children as in need of aid and placed them in OCS's legal custody,[6] but ordered them returned to their parents' physical custody under OCS's supervision on a number of conditions, including that the parents not consume alcohol or have it present in their home.[7]

Charlotte and Jack's oldest daughter drowned a week later during a boating trip; Charlotte and Jack were intoxicated during the incident. OCS then petitioned for removal of the three remaining children, and the superior court approved the removal. Eventually the children were placed with their paternal grandparents in Tuntutuliak.[8]

OCS's permanency plan for the children was to reunify them with their parents. After a December 2017 review hearing, the superior court ordered that the plan

---

[4] (...continued) under enumerated conditions with direction to petition for court order regarding child in need of aid); CINA Rule 6 (regarding emergency custody proceedings).

[5] *See* AS 47.10.080(c)(1) (authorizing court to grant OCS temporary custody of a child in need of aid); CINA Rule 7 (regarding child in need of aid adjudication proceedings).

[6] *See* AS 47.10.011 (enumerating circumstances in which "court may find a child to be a child in need of aid"). The superior court found the children to be in need of aid under subsection 10, authorizing such a finding when the "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant . . . result[ing] in a substantial risk of harm to the child."

[7] *See* AS 47.10.080(c)(2) (authorizing courts to release child in need of aid to "a parent, adult family member, or guardian," and requiring courts ordering such disposition to "direct [OCS] to supervise the care and treatment given to the child").

[8] *See* AS 47.10.084(a) (imposing on OCS, when possessing legal custody of child in need of aid, "responsibility of . . . determin[ing] . . . where and with whom the child shall live"); 25 U.S.C. § 1915(b)(i) (granting preference in foster care placement of Indian child under ICWA to "a member of the Indian child's extended family").

remain reunification, but the court extended OCS's legal custody until February 2018. The December order included a finding that OCS had made "active efforts" toward reunification but that neither Charlotte nor Jack had made progress toward this goal.[9] The order also included a finding, stipulated to by the parents, that their continued custody would be "likely to result in serious emotional or physical damage to the child[ren]."[10]

On February 22, 2018, the superior court reaffirmed its findings from the December order and extended OCS custody until June. Neither Charlotte nor Jack at that time contested the custody extension or the underlying findings. The written order was circulated on February 27.

### B. Removal Of The Children From Their Paternal Grandparents' Home In Tuntutuliak And Transfer To Bethel For Placement With Their Maternal Grandmother And Aunt

Meanwhile, on February 20 a state trooper received a tip that Charlotte and Jack were present with the children in the grandparents' home and that Jack was intoxicated and wielding a shotgun. The trooper called the grandparents' home and spoke to Jack's brother, who said that Jack was in the home with the children and that Jack had threatened Charlotte with a shotgun. Another trooper then was scheduled to fly to the village and check on the home.

---

[9]    *Cf.* 25 U.S.C. § 1912(d) (requiring that "[a]ny party seeking to effect a foster care placement . . . shall satisfy the court that active efforts have been made to . . . prevent the breakup of the Indian family and that these efforts have proved unsuccessful").

[10]    *Cf.* 25 U.S.C. § 1912(e) (prohibiting foster care placements absent "a determination, supported by clear and convincing evidence, . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child").

On February 26 a Bethel OCS worker received a call from a Tuntutuliak coworker reporting that Charlotte and Jack were living with the children in the grandparents' home and that the children might need removal. The Bethel OCS worker decided to travel to the home to investigate, and she called the state troopers for an escort because of Jack's status as a "high threat" client. During the call she learned of the reported shotgun incident and the trooper's scheduled visit. On February 27 the OCS worker, the trooper, and a Yup'ik interpreter arrived at the home; Jack, the grandparents, and one of the children were present there. The grandfather told the OCS worker — through the interpreter — that Jack had been drinking continuously in the home to the point of violence, forcing the grandparents to flee with the children. The OCS worker and the trooper immediately removed the children. The children were placed with their maternal grandmother and aunt in Bethel, some 50 miles from Tuntutuliak.[11]

## C.    Placement Review Proceedings

Charlotte moved for a foster care placement review hearing the same day the children were removed,[12] and the superior court held a hearing on March 21. After hearing testimony from the grandparents, the troopers who received the call about Jack and visited the grandparents' home, the OCS worker, and the interpreter, the court issued an oral ruling upholding the foster placement transfer. The court found Charlotte had not carried her burden of presenting clear and convincing evidence that the transfer was contrary to the children's best interests. Charlotte appeals.

---

[11]    OCS "may transfer a child, in the child's best interests, from one placement setting to another." AS 47.10.080(s).

[12]    *See id.* ("A party opposed to [a] proposed transfer may request a hearing and must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child for the court to deny the transfer.").

## III. STANDARD OF REVIEW

Best interests determinations are findings of fact we review for clear error.[13] We will uphold findings of fact unless, "after reviewing the record in the light most favorable to the prevailing party, we are left with 'a definite and firm conviction that a mistake has been made.' "[14] The superior court weighs witness credibility and conflicting evidence, and we will generally defer to the superior court's judgment if it rests on clear evidence in the record.[15]

Whether the superior court's ruling complied with statute is a question of law, which we review de novo, "adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[16]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Finding Charlotte Failed To Show Removal Was Contrary To The Children's Best Interests.

OCS may transfer a child in its custody between foster care placements if

---

[13] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[14] *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[15] *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001) ("[I]t is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence." (quoting *Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999))); *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (footnote omitted) ("[W]e ordinarily will not overturn a trial court's finding based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling.").

[16] *See Kylie L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 407 P.3d 442, 448 (Alaska 2017) (quoting *Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 643 (Alaska 2013)).

it determines that the transfer would be in the child's best interests.[17] "A party opposed to [a] proposed transfer may request a hearing and must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child for the court to deny the transfer."[18] Charlotte argues the superior court erred by finding that the transfer was not contrary to the children's best interests because it relied on unsubstantiated claims that her and Jack's continued drinking harmed the children, while failing to consider substantial harms from separating the children from their community and culture. She contends that ICWA's purposes and the language of Alaska's statutes direct courts to consider community and cultural separation when making best interests determinations.

The superior court was presented with credible evidence that Jack continued to drink and that his drinking endangered the children. Although the children's paternal grandfather denied seeing Jack drunk, the grandfather also said several times that Jack had come to the home drunk and that the grandfather moved the children for this reason. The accounts of Jack's drinking are corroborated by the interpreter accompanying the OCS worker to the grandparents' home the day the children were removed; the interpreter testified that the grandfather complained that Jack drank continually in the home and became violent.

Charlotte provided no evidence to the superior court that cultural or social differences between the children's home village of Tuntutuliak and the grandmother and aunt's home in Bethel would harm the children. She raises this abstract issue for the first time on appeal. We may consider an issue raised for the first time on appeal if the superior court's failure to consider it amounts to plain error. Plain error directs us to

---

[17]    AS 47.10.080(s).

[18]    *Id.*

consider issues not raised before the superior court only if "an obvious mistake has been made which creates a high likelihood that injustice has resulted."[19] But any failure of the superior court to comply with an alleged statutory mandate that it consider such differences would not rise to the level of plain error, because there is no reason to believe those considerations would have changed the court's ruling.

Charlotte's comparison of Tuntutuliak and Bethel — as presented in her briefing — shows no significant demographic or cultural divergence. Conceding that Yup'ik culture predominates in both communities, she stresses that Alaska Natives comprise 95.88% of Tuntutuliak's population and only 66.17% of Bethel's population. But Alaska Natives still are a large majority — nearly two-thirds — of Bethel's residents, a significance reflected by the dominance of Yup'ik culture in both communities. And other than mentioning that Bethel is larger, with urban utilities and more populated schools, Charlotte does not explain how demographic differences might otherwise translate into significant or, more importantly, harmful cultural disparities. In short Charlotte does not persuasively explain how living in an ICWA-compliant placement with family members in Bethel will harm her children.

We conclude that the superior court did not clearly err by finding that the foster care transfer was not contrary to the children's best interests.

**B.      The Superior Court Did Not Err By Failing To Make Superfluous Active Efforts And Continuing Custody Findings When Approving The Transfer.**

ICWA prohibits state courts from approving foster care placements unless the party seeking approval shows that "active efforts have been made to . . . prevent the

---

[19]      *State, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Michelle P.*, 411 P.3d 576, 586 (Alaska 2018) (quoting *Kyle S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 1262, 1267 (Alaska 2013)).

breakup of the Indian family and that these efforts have proved unsuccessful."[20] ICWA also prohibits state courts from approving foster care placements unless a court finds that "continued custody of the [Indian] child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[21] Charlotte argues that transferring her children to live with their maternal grandmother and aunt in Bethel qualifies as a foster care placement under ICWA and that the superior court violated ICWA by approving the transfer without making active efforts or continued custody determinations.[22] Again, Charlotte makes this argument for the first time on appeal. She did not raise the issue in the superior court, which would have given that court the opportunity to make the findings, if they were necessary.

Charlotte nonetheless ignores that the superior court made those findings in its December 2017 order and reaffirmed them on February 22 — only five days before the children's placement transfer — when it extended OCS's custody of the children to June. Charlotte did not contest the extension of OCS's custody or the court's reaffirmation of its necessary underlying findings at that time. Given that the superior court's active efforts and continued custody findings were essentially contemporaneous and effective as of the placement transfer, we conclude that, in the context of this case, the superior court did not violate ICWA by approving the placement transfer.

---

[20]     25 U.S.C. § 1912(d).

[21]     25 U.S.C. § 1912(e).

[22]     *See Ronald H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Nos. S-16725/16855, 2018 WL 1611648 (Alaska Mar. 28, 2018) (stating that court must make finding under 25 U.S.C. § 1912(e) before placing Indian child in foster care or changing placement). *Ronald H.* was a memorandum decision and did not create legal precedent. *See* Alaska R. App. P. 214(d).

## V. CONCLUSION

We AFFIRM the superior court's decision.