**ERICA A., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES, Appellee.**

**No. S-10234.**

Supreme Court of Alaska.

March 21, 2003.

Richard D. Kibby, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Thom F. Janidlo, Anchorage, Guardian ad Litem.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Erica A.[1] appeals the superior court's order terminating her parental rights to her children Kevin S. and Amy K. The superior court correctly applied the termination statute, AS 47.10.088, to the facts of this case and did not err in any other respect. We therefore affirm the superior court's order.

## II. FACTS AND PROCEEDINGS

Erica A. is a thirty-four-year-old mother of five children. Her involvement with the Department of Health and Social Services, Division of Family and Youth Services began in 1989. At the time, Erica had a daughter by her then-husband, Edward, and a son from a previous relationship. Between May and October 1989, the division received four reports of harm alleging that Erica and Edward had neglected the children, that Erica had a substance abuse problem, and that Edward had physically abused the children. Erica admitted that she used cocaine, crystal methamphetamine, acid, and speed while pregnant. The division referred Erica to homemaker services and substance abuse treatment.

By 1990 Erica had a third child, her second by Edward. The division responded to a report of physical abuse, but closed its case on Erica's children after establishing that they were in the custody of Edward's parents. Later that year, the division learned that Erica had taken the children out of Alaska.

Erica again came to the division's attention in 1992. That year, the division took emergency custody of all three children after a doctor's examination substantiated reports of sexual abuse. The division never identified the perpetrator with certainty, but it instructed Erica to prevent contact between her children and her teenage half brother. Despite this instruction, the division received a report that Erica and her mother had left her children in her half brother's care while they went to church. The division paid for a psychological evaluation of Erica's half brother, which recommended that he not be left unsupervised with children. Erica additionally failed to protect her older children from a boyfriend, Brian S., who would become the father of Kevin and Amy. The division told Erica to keep Brian away from her children after it received a report that he had physically abused the oldest child and held an unloaded gun to the head of Erica's young cousin. Erica nevertheless continued to allow Brian into her home.

The division developed case plans for Erica in 1992–93 and provided services including psychological evaluations, home-based services to improve parenting and everyday living skills, a substance abuse evaluation, therapy sessions for Erica and her children, and parenting classes. When Erica became involved in a legal dispute with Edward and his parents over custody of the three oldest children, the division referred her to an attorney. The superior court granted custody of Edward's children to him, and granted custo-

1. Pseudonyms are used throughout the opinion to protect the privacy of those involved.

dy of Erica's oldest child to Edward's parents, even though they are not biologically related to the child. All of them later left Alaska, and Erica has had no contact with them for several years.

In 1993 Erica gave birth to Kevin, a child fathered by Brian. The division took legal custody of Kevin soon after he was born, citing Erica's lack of progress on her earlier case plans and her ongoing substance abuse. Erica admitted that she used marijuana and alcohol during the pregnancy. Brian was incarcerated when Kevin was born. The division filed a petition for Kevin's adjudication as a child in need of aid. Erica stipulated to his status as a child in need of aid. In the three months after Kevin was born, the division provided sixty-three hours of direct services to Erica, including assistance locating housing and family support classes.

By July 1994 Erica, Brian, and Kevin were living together in Wasilla. In a disposition order entered in July 1994, the superior court continued the state's legal custody of Kevin but allowed Erica and Brian to retain physical custody. The division referred Erica and Brian to parenting classes and counseling to address the effects of sexual abuse that each parent had suffered in childhood.

In April 1995 the division determined that Kevin was not at risk in his parents' custody and closed its case on Kevin, although Kevin's guardian ad litem expressed reservations about the parents' failure to comply with their case plan. A month later, Erica and Kevin—apparently no longer living with Brian—were evicted from their home in a trailer park. Their trailer caught fire as they were moving out. Erica was charged with arson and pleaded no contest to criminal mischief, for which she received a suspended sentence and three years' probation.

That summer Erica tried to break into Brian's trailer and ended up in a fight with Brian and his new girlfriend. The police found Erica and Kevin in a van outside the trailer; Erica had been cut during the fight, and both she and Kevin were smeared with her blood. Kevin was dressed only in an adult t-shirt. Erica was charged with one count of child abuse, one count of assault, and one count of unauthorized entry. She eventually pleaded no contest to disorderly conduct.

Erica and Kevin moved in with Erica's aunt, whose parental rights to her own children had been terminated and who had sexually abused Erica during childhood. On one occasion when Erica left Kevin at home, her aunt physically abused him by hitting him and throwing him across the room. A social worker responding to a report of harm about the incident discovered that Kevin had bruises and blood blisters. The division again took custody of Kevin in September 1995 and filed a petition for his adjudication as a child in need of aid based on this physical abuse and on Erica's fight at Brian's trailer. Kevin was placed in foster care.

The following month, October 1995, Erica was sentenced on her disorderly conduct conviction. The district court imposed a ninety-day suspended sentence with three years of probation and required her to participate in parenting classes, alcohol abuse treatment, and a domestic violence intervention program. The division worked with the alcohol abuse program to refer Erica to the Reflections residential substance abuse treatment program. The division returned Kevin to Erica's physical custody after her admission to the program, but retained legal custody. It moved Kevin back to foster care after program staff and participants observed Erica failing to bathe Kevin, leaving him alone or with strangers while she went to smoke a cigarette, and hitting him. After Kevin returned to foster care, his foster mother reported that he had tried to touch her vaginal area and had attempted to injure himself and the family dog.

Erica was discharged from Reflections early in February 1996 for failing to follow rules and complete assigned tasks. The Reflections staff recommended that she continue with residential substance abuse treatment; although Akeela House had space available for Erica, she declined to continue treatment. The superior court adjudicated Kevin to be a child in need of aid in August 1996; in December 1996 it issued a disposition order placing him in state custody for two years.

Upon receiving formal legal custody of Kevin, the division placed him in Erica's

physical custody, and the two lived with Erica's mother. The division provided counseling, home-based therapy, bus passes, and assistance in keeping track of Erica's appointments. In March 1997 Erica purchased a trailer and moved into it with Kevin. The division provided a substance abuse assessment, which concluded that Erica did not need additional treatment. The division therefore requested, and the superior court approved, Kevin's release into Erica's legal custody in June 1997.

Three months later, in September 1997, the division received an anonymous report about Erica's care of Kevin. The reporter alleged that Erica's trailer was filthy, that she allowed runaway teenagers into her home and used crack cocaine with them in front of Kevin, and that Kevin displayed highly sexualized behavior. The division did not investigate that report. But in December 1997 Erica was arrested for maintaining a crack house after she allowed a drug dealer to live in the home with her and Kevin. Police found a crack pipe in her hand, and she admitted to smoking crack that morning. Erica was pregnant with Amy at the time. Erica was charged with misconduct involving a controlled substance and was incarcerated pending disposition of her charge.

After her arrest, Erica arranged for Kevin to live with her brother in Palmer. Upon investigation, the division determined that Kevin was not at risk in Erica's brother's home and did not take custody of him.

In January 1998 the Department of Corrections placed Erica in the Dena A. Coy program, which provides residential substance abuse treatment for expectant mothers. Amy was born in February 1998, two months premature. At the time, Erica was unable to identify Amy's father. (A paternity test later established that Brian was the father.) Because of her premature birth, Amy suffered serious health problems, which made it difficult for Erica to participate in substance abuse treatment; as a result, she was discharged early from Dena A. Coy.

Between May and June, Erica was released from jail to her parents' third-party custody. After her release, the division provided bus passes, taxi vouchers, counseling, a psychological evaluation, and assistance in organizing her appointments. By June 1998 the division had helped Erica enroll in the New Dawn long-term after care program. At New Dawn, Erica was disciplined for nursing the infant Amy in the rain while Erica smoked a cigarette.

Erica eventually pleaded no contest to misconduct involving a controlled substance. In August 1998 the superior court sentenced her to twenty-one months in jail. She then entered the Hiland Mountain Correctional Center to serve her sentence.

Meanwhile, in March 1998, the division had filed a petition to adjudicate Amy a child in need of aid based on Erica's history of substance abuse. In July the superior court had found Amy to be a child in need of aid and had committed her to the state's temporary custody pending disposition. But the division allowed Amy to remain in Erica's physical custody until Erica returned to jail in August 1998. The division then allowed Erica to place Amy with a family friend, Connie H. The division provided services to address Amy's physical and cognitive developmental delays.

In January 1999 the superior court held a disposition hearing and committed Amy to state custody for two years. At that time the division planned to pursue guardianship of Amy by Connie. But Connie soon decided that she could no longer care for Amy and returned her to Erica's mother. The division agreed to the placement and filed a permanency report with the superior court in August 1999, recommending termination of Erica's parental rights and adoption by Erica's mother. Erica's social worker testified at the termination trial that he instructed Erica's mother not to allow unsupervised visits between Erica and Amy, though Erica's mother maintained that she was never informed of the restriction. The social worker also testified that Erica's mother disagreed with the division's assessment that Erica had serious deficiencies as a parent, but agreed to comply with any conditions that would allow Erica's mother to have permanent custody of Amy.

The Department of Corrections released Erica from custody in July 1999. She remained on probation for her criminal mischief conviction. The state did not then have custody of Kevin, believing that he was living with Erica's father. But in October 1999 the division received a report of harm regarding Kevin and at least one other child at Erica's trailer. The report alleged that Erica had smoked crack in front of six-year-old Kevin, that Kevin played outdoors without shoes, that he played with fire and a BB gun, and that Erica left unspecified children unattended while she slept. When a social worker arrived at Erica's home to investigate, he found her trailer dirty and messy. Kevin was not there, but Erica was home with a toddler. A woman Erica could not identify was asleep on the sofa. Erica told the social worker she was babysitting the toddler, but admitted that the child was Amy after the child called Erica "mommy." Erica also told the social workers that Kevin had been living with her, not with Erica's father. The division's social workers contacted Kevin at school. Kevin told them that his home was very messy, that many people came and went, and that the people there fought a lot—swearing, kicking, and punching.

The division took emergency custody of both children. They initially attempted to place Kevin with Erica's father. But when they were unable to contact him, they placed both children in emergency foster care. The division petitioned for custody of Kevin, alleging that he was a child in need of aid. At a temporary custody hearing the superior court found probable cause to believe that Kevin was a child in need of aid and committed him to the temporary custody of the division. Kevin's adjudication hearing was set for January 2000 but was continued several times upon motions filed by both parties.

Kevin was placed in foster care but his behavioral problems proved too severe for his foster family. His problems include sexualized behavior, head banging, biting, fire setting, defecating in his pants, and violence towards animals. He also exhibited fear for his security, including an inability to sleep unless an adult was present, nightmares, and verbal expressions of concern for his physical safety. Because of his special needs, Kevin was institutionalized at Charter North/North Star, then transitioned to therapeutic foster care.

Amy had already been declared a child in need of aid and placed in state custody until January 29, 2001. The division decided not to return Amy to her grandmother's care, since Erica's mother had allowed Erica to have unsupervised visits with Amy, and the division no longer trusted her to protect the child. Amy thus has remained in a preadoptive foster home since October 1999.

From October 1999 to September 2000 Erica was consistently employed, but her place of employment and work schedule changed frequently. The division scheduled weekly visitation between Erica and her children beginning in October 1999. Erica had difficulty coordinating her work schedule, the bus schedule, and the visitation schedule, and she was late or did not attend several visits. In response, the division helped her figure out which bus would arrive on time. In February 2000 the division assisted Erica in scheduling a substance abuse assessment. Erica's social worker called her home and learned that she was letting two men she knew only by first name live with her. Between January and April 2000, the police went to Erica's trailer three times to investigate disturbances. In one instance, a man who slept in Erica's laundry room became violent after drinking, and in another case Erica's boyfriend punched her in the eye. In the third case, Erica was so drunk she could hardly stay awake to answer the officer's questions.

In June 2000 the state petitioned to revoke Erica's probation, alleging that she had violated her conditions by changing her residence without permission, consuming alcohol, ingesting cocaine, failing to undergo a substance abuse assessment, failing to maintain full-time employment, failing to complete a mental health evaluation, and failing to make restitution payments for the trailer that she burned down in 1995. The superior court released her on bail, and the division and her probation officer referred her to the residential substance abuse treatment program at Akeela House.

In May 2000, a month before Erica was charged with violating the conditions of her probation, the division filed a petition to terminate Erica's parental rights to both Kevin and Amy. The division jointly petitioned to terminate Brian S.'s parental rights, as well, but it later moved for and received a continuance as to Brian so that it could conduct paternity testing to determine if he was Amy's father. Erica's termination trial was thus severed from Brian's. The court consolidated Kevin's child-in-need-of-aid adjudication hearing with the termination trial. The trial took place over thirteen days between January and April 2001. At the end of the trial, the superior court terminated Erica's parental rights to Kevin and Amy.

Erica appeals.

## III. DISCUSSION

### A. Standard of Review

We apply the clearly erroneous standard when reviewing the superior court's factual findings.[2] Factual findings are clearly erroneous when we are convinced, upon review of the entire record, that a mistake has been made.[3] Whether the superior court's factual findings satisfy applicable CINA rules is a question of law subject to de novo review.[4]

### B. The Superior Court Correctly Applied AS 47.10.088.

A court entering an order that terminates parental rights must find by clear and convincing evidence that the child was subjected to conduct or conditions placing the child in need of aid under AS 47.10.011 and that the parent has failed within a reasonable period of time to remedy the conditions that place the child at risk.[5] The court must further find, by a preponderance of the evidence, that the division made reasonable efforts under AS 47.10.086 to provide family services to enable the child to return home.[6] Finally,

2. *See M.W. v. State, Dep't of Health & Social Servs.*, 20 P.3d 1141, 1143 (Alaska 2001).

3. *See id.* at 1143.

4. *See id.*

5. AS 47.10.088(a)(1).

AS 47.10.088 provides, in relevant part:

(a) [T]he rights and responsibilities of the parent regarding the child may be terminated for purposes of freeing a child for adoption or other permanent placement if the court finds

(1) by clear and convincing evidence that

(A) the child has been subjected to conduct or conditions described in AS 47.10.011; and

(B) the parent

(i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury; and

(2) by preponderance of the evidence that the department has complied with the provisions of AS 47.10.086 concerning reasonable efforts.

. . . .

(c) In a proceeding under this chapter involving termination of the parental right of a parent, the court shall consider the best interests of the child.

AS 47.10.011 provides, in relevant part:

Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:

. . . .

(6) the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately;

. . . .

(9) conduct by or conditions created by the parent, guardian, or custodian have subjected the child or another child in the same household to neglect;

(10) the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child. . . .

6. AS 47.10.088(a)(2).

The reasonable efforts provisions of AS 47.10.086 provide, in relevant part:

(a) Except as provided in (b) and (c) of this section, the department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of

the court must find that termination is in the child's best interests.[7] Erica challenges the trial court's reasonable efforts and best interests findings.

### 1. Reasonable efforts

The trial court found by "more than a preponderance of the evidence" that the division made reasonable efforts to prevent the breakup of Erica's family. But Erica, focusing on the narrow time frame between January 1999 and November 2000, contends that the division failed to make reasonable efforts. Specifically, Erica argues that during this period the state did not provide the particular services that would have addressed her problems, including assistance with "thinking, organizing, and co-dependence," "treatment for depression," and a bonding assessment of Amy. She also alleges that the division did not provide reasonable visitation after Kevin and Amy were removed from her home. The state responds that Erica did, in fact, receive services of the type she denies receiving. The state also argues that the reasonableness of its efforts during the disputed period must be evaluated in light of the extensive services it provided over the entire course of the division's involvement with Erica.

The record establishes that the state provided a number of services in the disputed period. Between September 1998 and May 1999, while serving her sentence for misconduct involving a controlled substance, Erica participated in a halfway house program at Akeela House. Although the Department of Corrections placed her in the program, we have held that "[i]t is of no particular consequence that the Department of Corrections ... rather than DFYS" provided a particular service.[8] In March 1999 the division referred Erica for one of several psychological evaluations that it provided over the years. Although the record does not indicate that Erica received any services between her release from Akeela House sometime after April 1999 and the removal of Kevin and Amy from her care in October 1999, after their removal in October the division consistently offered services to assist Kevin and Amy and facilitate their return home, including services to help address Kevin's special needs. It also offered Erica a urinalysis program, a substance abuse assessment, visitation with Kevin and Amy,[9] further residential treatment for substance abuse at Akeela House, and referrals for counseling to address the issues underlying Erica's substance abuse, such as depression and co-dependence.

In any event, as the state correctly recognizes, the reasonableness of the division's efforts in 1999 and 2000 must be viewed in light of the entire history of services that the state had already provided.[10] As detailed

the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;
(2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to community-based family support services whenever community-based services are available and desired by the parent or guardian; and
(3) document the department's actions that are taken under (1) and (2) of this subsection.

7. *See* AS 47.10.088(c); *see also* CINA Rule 18(c)(2)(C) (requiring the superior court to find by a preponderance of the evidence that termination of parental rights is in the best interests of the child).

8. *A.M. v. State,* 945 P.2d 296, 305 (Alaska 1997).

9. Although more visitation might have been possible during the disputed period, the record suggests that Erica bears much of the responsibility for the limited visitation. Erica's social worker submitted an affidavit documenting twelve scheduled visits between December 17, 1999 and February 24, 2000, of which four occurred. Six did not occur because Erica was late or failed to appear. Kevin missed one visit because of a doctor appointment, and Amy missed one visit because her foster parents could not transport her to the visit. One visit did not occur because the social worker was out of town. The social worker also stated that he helped Erica figure out which bus would arrive in time for the visits, and that he contacted her three times regarding visitation and took her calls six times.

10. *E.A. v. State,* 46 P.3d 986, 990 (Alaska 2002).

above in the statement of facts, Erica's substance abuse and parenting problems arose well before Kevin and Amy were born, and the division had already made substantial efforts to assist Erica before it intervened on behalf of Kevin and Amy. Between Kevin's birth in September 1993 and the beginning of the disputed period here, January 1999, the division continued to make extensive efforts. In fact, Erica stipulated to the reasonableness of the state's efforts from July 1992 through August 1996 and does not challenge the court's finding of reasonable efforts for the period between September 1996 and January 1999.

We have held that "the state's efforts to prevent breakup of the entire family" may be considered "in assessing whether that effort was sufficient" with respect to a particular child.[11] Thus, in determining what efforts would be reasonable for Erica from January 1999 onward, the court was entitled to consider the division's extensive history of efforts and Erica's consistent lack of success at addressing problems. When viewed in light of this history, the superior court's finding of reasonable efforts is not clearly erroneous.

**2. Best interests**

■ Alaska Statute 47.10.088 requires the court to consider whether termination of parental rights is in the best interests of the child.[12] Erica challenges the superior court's best interests finding. She points to her care of Amy during the child's first six months and her family physician's assessment that Amy is developmentally age-appropriate. Erica also contends that she has support from family members, pointing to their care of Kevin while she was incarcerated in 1998.

Erica further argues that the superior court should have adopted the recommendations of Dr. Bruce Smith rather than those of Dr. Richard Lazur. Both psychologists evaluated Erica's parenting capacity in 1999. Dr. Lazur believed that Erica was unlikely ever to be capable of parenting. In contrast, although Dr. Smith agreed that Erica should not have primary responsibility for parenting her children, he suggested a permanent plan that would allow her frequent contact with the children by placing them in the primary custody of Erica's parents, who could provide for their day-to-day parenting needs. Dr. Smith believed that this arrangement "would appear to meet the best interest[s] of the children." Erica insists that Dr. Smith was more objective and credible than Dr. Lazur.

But the trial court, not this court, decides issues of credibility.[13] "Because of the unique ability of the trial court to assess credibility, this court consistently grants deference to trial courts where credibility is at issue."[14] Here, the superior court could reasonably find Dr. Lazur's testimony more persuasive than Dr. Smith's. Moreover, the record does not suggest that the superior court believed that either psychologist's testimony was crucial. The court's best interests findings appear to rely on evidence establishing that a permanent plan calling for Erica's parents to have primary custody was not a viable option. Undisputed evidence showed that neither parent was willing to care for Kevin. And although Erica's mother did say that she would be willing to assist Erica by taking primary custody of Amy, ample evidence supports the superior court's decision that Erica's mother would be unlikely to protect Amy from Erica: Erica's mother had repeatedly allowed Erica to have unsupervised visits with Amy, had a history of failing to follow the division's directions concerning her sister's children, and persistently refused to acknowledge that Erica had serious parenting and substance abuse problems.

As is clear from the statement of facts, the state presented overwhelming evidence of Erica's repeated failure to care appropriately for her children and her longstanding lack of success in substance abuse treatment. Erica's background is checkered with periods of

11. *Id.* at 991.

12. AS 47.10.088(c) provides:
In a proceeding under this chapter involving termination of the parental right of a parent, the court shall consider the best interests of the child.

13. *See In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001).

14. *Wasserman v. Bartholomew*, 38 P.3d 1162, 1167 (Alaska 2002).

progress and backslide. Although at the end of the trial, in April 2001, Erica showed signs of improvement, her counselor estimated that it would take at least another year for her to be able to demonstrate her ability to care for her children—assuming that she continued to progress. When viewed in light of the record as a whole, the superior court's best interests findings are supported by substantial evidence and are not clearly erroneous.

### C. Misapplication of Facts

Erica further alleges that the superior court failed to separately consider the evidence as it related to each child and that it applied evidence concerning individual children to both. Specifically, Erica challenges a finding as to Kevin in the superior court's December 1999 temporary commitment order that, according to Erica, was based on evidence relating only to Amy. Erica also argues that because Dr. Lazur's evaluation of her parenting skills focused only on her relationship with Amy, the evaluation had no bearing on her ability to parent Kevin. But Erica's own counsel drafted the final findings in the temporary commitment order; and, in any event, the termination order now renders those findings moot. Furthermore, as already discussed above, psychological testimony did not play a crucial role in the trial court's ruling—particularly as to Kevin, since neither of Erica's parents was willing to assume primary custody of Kevin. In short, Erica's claims are meritless.

### D. Jurisdiction

Erica argues that the superior court lacked jurisdiction over Amy. Erica's argument is based on the following circumstances.

On January 29, 1999, the superior court ordered Amy committed to the division's custody for two years. Because of multiple continuances requested by both parties, the termination trial did not begin until the day custody expired—January 29, 2001. At the time, none of the parties realized that the division's custody over Amy had expired. But the division soon recognized the problem. On February 21, 2001, it filed an emergency petition to adjudicate Amy a child in need of aid, and on February 26, the superior court entered an order renewing the state's custody of Amy based on a renewed finding that Amy was a child in need of aid. Meanwhile, on February 22, Erica had signed a power of attorney purporting to give her mother authority over Amy's "care custody and upbringing."

Erica essentially reasons that because she gave legal custody of Amy to her mother during a lapse in the state's custody, the court lacked jurisdiction to reassume custody. But Erica's power of attorney was not an assignment of legal custody; it simply gave Erica's mother authority to act in her stead in matters concerning Amy's care, custody, and upbringing. Erica cites no authority for the proposition that the document had any effect on the court's jurisdiction. Under AS 47.10.080(c), the superior court has authority to extend a two-year child-in-need-of-aid commitment for an additional year upon a showing that the extension would be in the child's best interests.[15] Nothing in the statutory grant of authority precludes the extension from being implemented after the initial two-year commitment has technically expired. Erica's jurisdictional argument thus lacks merit.

### E. Due Process

The children's father, Brian S., was in jail throughout the termination trial. The state's petition initially sought to terminate both Erica's and Brian's parental rights, but the state moved for and the court granted a continuance of Brian's termination trial. Although the continuance severed Brian's case from Erica's, the court allowed Brian's counsel to attend and participate in Erica's trial. Brian was present telephonically.

Erica contends that terminating her parental rights before Brian was released from jail violated her due process rights because it prevented her from benefitting from having

15. AS 47.10.080 provides, in relevant part:
(c) If the court finds that the child is a child in need of aid, the court shall
(1) order the child committed to the department for placement in an appropriate setting for a period of time not to exceed two years ... except that the department or the child's guardian ad litem may petition for and the court may grant in a hearing
(A) one-year extensions of commitment ... if the extension is in the best interests of the child[.]

additional time to progress in her treatment program. She further contends that allowing Brian's counsel to participate at her trial violated her due process rights because it allowed three attorneys (the state, the guardian ad litem, and the father's counsel) to argue for termination. The state responds that this argument is waived because Erica has failed to show how Brian's participation prejudiced her. The guardian ad litem adds that Erica cites no legal support for these claims.

The superior court considered Erica's objection to Brian's presence and participation but decided to allow it. As the children's biological parent, Brian had a legitimate interest in Erica's termination proceedings. Erica has cited no legal authority suggesting that the superior court erred in allowing him to attend and to be represented by counsel, and we are aware of no such authority. Moreover, Erica provides no basis for her claim of a constitutional right to additional time in treatment. We find no error in the trial court's decision.

### F. Foster Care Placement

Barring certain exceptions, AS 47.14.100 prohibits the state from placing a child in foster care if a relative requests placement of the child in the relative's home.[16] Erica contends that when the state took emergency custody of Kevin and Amy in October 1999, it should have placed them with relatives rather than in foster care. This error, she argues, entitles her to a reversal of the superior court's termination order.

The state and the guardian ad litem correctly respond that the October 1999 temporary custody order is not properly before this court. This appeal is from the superior court's ultimate decision to terminate Erica's parental rights. In reaching its termination decision, the superior court was not required to revisit its earlier placement decision and its termination order superseded all earlier placement orders.[17] As the state correctly points out, Erica could have challenged those placement decisions by requesting superior court review.[18] Erica could then have petitioned this court for review of the superior court's ruling.[19] Because Erica failed to seek timely review, the superior court's termination order now renders earlier issues of placement moot.[20]

### G. Remaining Claims

Erica raises several additional claims that she has not properly preserved for review. Specifically, Erica claims that the superior

**16.** AS 47.14.100 provides, in relevant part:

> (e) A child may not be placed in a foster home or in the care of an agency or institution providing care for children if a relative by blood or marriage requests placement of the child in the relative's home. However, the department may retain custody of the child and provide for its placement in the same manner as for other children if the department
> (1) makes a determination, supported by clear and convincing evidence, that placement of the child with the relative will result in physical or mental injury . . . ;
> (2) determines that a member of the relative's household who is 12 years of age or older was the perpetrator in a substantiated report of abuse under AS 47.17; or
> (3) determines that a member of the relative's household who is 12 years of age or older is under arrest for, charged with, has been convicted of, or has been found not guilty by reason of insanity of, a serious offense. . . .
>
> . . . .
>
> (f) . . . Nothing in . . . (e) of this section applies to child placement for adoptive purposes.

**17.** *See* AS 47.10.088; CINA Rule 18.

**18.** CINA Rule 19.1(b) provides for superior court review of placement decisions:

> At any time in a proceeding, a party who is opposed to the Department transferring a child from one placement to another may move the court for a review hearing at which the requesting party must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child[.]

**19.** *See* Alaska Appellate Rule 402, which provides in pertinent part that:

> An aggrieved party . . . may petition the appellate court as provided in Rule 403 to review any order or decision of the trial court, not appealable under Rule 202, and not subject to a petition for hearing under Rule 302, in any action or proceeding. . . .

**20.** Erica similarly challenges the trial court's denial of her March 2000 motion for a hearing to review Kevin's placement in Charter North and

court erred in October 1999 when it found probable cause to believe that Kevin was a child in need of aid; that the state abridged her due process rights by failing to investigate the circumstances surrounding Amy's presence in Erica's home in October 1999 and by failing to provide notice to Erica's mother that Amy was not allowed unsupervised visits with Erica; and that the superior court violated her due process rights by relying on an unsigned case plan and by failing to hold adjudication and permanency hearings for Kevin within the statutorily mandated time frame.

Erica has failed to cite any point in the record where she raised these issues; our review of the record has not uncovered any indication that she did so. We will not review issues that were not properly raised in the trial court.[21]

## IV. CONCLUSION

We AFFIRM the superior court's order terminating Erica's parental rights to Kevin and Amy.

Amy's placement with her foster family. This claim likewise is moot.

21. *See, e.g., D.E.D. v. State,* 704 P.2d 774, 780 (Alaska 1985).