**NOTICE**

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JEREMIAH H., | ) | |
| | ) | Supreme Court Nos. S-19328/19337 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court No. 3PA-20-00147 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF FAMILY & COMMUNITY | ) | AND JUDGMENT* |
| SERVICES, OFFICE OF CHILDREN'S | ) | |
| SERVICES, | ) | No. 2132 – January 28, 2026 |
| Appellee. | ) | |
| | ) | |
| | ) | |
| JOCELYN H., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF CHILDREN'S | ) | |
| SERVICES, | ) | |
| Appellee. | ) | |
| | ) | |

Appeals from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Jonathan A. Woodman, Judge.

---

\*      Entered under Alaska Appellate Rule 214.

Appearances: Justin Gillette, Assistant Public Defender, Anchorage, and Terrence Haas, Public Defender, Anchorage, for Appellant Jeremiah H. Michael L. Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant Jocelyn H. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Borghesan, Henderson, Pate, and Oravec, Justices. [Carney, Chief Justice, not participating.]

## I. INTRODUCTION

The Office of Children's Services (OCS) assumed emergency custody of a child due to reports that the family struggled with domestic violence and substance abuse. OCS made case plans for each parent and referred them to various services designed to address the conduct that placed the child at risk. Several years later, the superior court terminated their parental rights. On appeal the father argues that OCS failed to make reasonable efforts to reunify him with his child. The mother argues that OCS failed to make reasonable reunification efforts toward her as well, and also argues that the superior court erred by finding she did not remedy the conduct that put the child at risk of harm. Seeing no reversible errors, we affirm the termination of both parents' rights.

## II. FACTS AND PROCEEDINGS

### A. Facts

Jeremiah H. and Jocelyn H. are the parents of Logan, who was born in 2015.[1] OCS petitioned for emergency custody of Logan in August 2020 due to concerns about domestic violence and Jeremiah's failure to register as a sex offender. In its petition, OCS described allegations of physical abuse within the family and frequent drinking, including some reports that Logan was hit, strangled, and given alcohol on

---

[1] We use pseudonyms to protect the family's privacy.

occasion.  OCS assigned a caseworker to Jeremiah and Jocelyn in September 2020.  The caseworker created case plans for Jeremiah and Jocelyn in October 2020 and reviewed each parent's case plan with that parent.

### 1.  Reunification efforts for Jeremiah

Jeremiah's initial case plan set three goals:  to maintain a home free of substance abuse; to maintain healthy relationships free of domestic violence while putting Logan's needs first; and to be "an appropriate, nurturing, and safe parent."  OCS referred Jeremiah for a substance abuse assessment, a domestic violence assessment, and a healthy relationships course.  Later, OCS updated his case plan with an additional goal of participating in a sex offender risk assessment and following its recommendations.

Around November 2020 Jeremiah was arrested.  That criminal case led to Jeremiah's referral to a different service provider for a substance abuse assessment.  Jeremiah's OCS caseworker coordinated with the provider and Jeremiah's parole officer.

In March 2021 Jeremiah completed the substance abuse assessment.  The assessor recommended intensive outpatient therapy, a psychoeducational program, urinary analyses or treatment compliance with either OCS or Jeremiah's parole officer, a mental health evaluation, and a physical.

In July 2021 Jeremiah began an intensive outpatient program with Alaska Family Services and made "satisfactory progress" during his participation.  But he was discharged from the program in September 2021 because he went back to jail.  Jeremiah took some classes related to sobriety while incarcerated, receiving a certificate for completing at least one class.  However, Jeremiah did not return to Alaska Family Services to complete his outpatient treatment.

Also in July 2021, Jeremiah completed a domestic violence assessment with Judy Gette over the phone.  Gette reported that Jeremiah did not take responsibility for problems in his relationships and minimized Logan's traumatic experiences.  Gette

also suspected that Jeremiah intentionally painted himself as a person with anger problems as a "smokescreen" to cover up "deeper problems involving sexual violence directed at children." According to Gette, Jeremiah scored in the highest (i.e., most concerning) range for anger management and alcohol abuse as part of a clinical anger management profile.

Accordingly, Gette recommended that Jeremiah engage in a sex offender treatment program, complete a 36-week batterer intervention program, and complete a substance abuse treatment program. She further recommended that Jeremiah receive individual counseling to address his own trauma, but noted other issues should be addressed in group counseling because "[Jeremiah] needs to be confronted about what he says and what he does." Gette also recommended that Jeremiah not be left alone with Logan unless he received therapeutic clearance from a sex offender therapist.

Jeremiah took some steps in line with Gette's recommendations. For example, he began an intervention program related to domestic violence. But he ultimately did not complete any of Gette's recommendations. Throughout the case Jeremiah refused to complete a sex offender risk assessment, nor did he complete the sex offender treatment program recommended by Gette.

### 2. Reunification efforts for Jocelyn

Jocelyn's case plan established two goals: "to maintain/cope with everyday stressors by establishing stability and positive routines through sobriety" and to "maintain[] healthy relationships that are free of domestic violence and put[] [Logan's] needs first." Jocelyn's case plan referred her to Alaska Youth & Family Network for a healthy relationships course and Alaska Family Services for a domestic violence victims' program.

Jocelyn initially was slow to complete the tasks on her case plan, but completed more as time went on. In February 2021 she completed an integrated behavioral assessment with Set Free. That assessment concluded that Jocelyn did not have current substance abuse issues and thus did not meet the criteria for treatment.

The assessment's behavioral component found that Jocelyn minimized allegations against Jeremiah and "lacked insight into the full reason" Logan was removed. At a case plan review in April 2021, Jocelyn's caseworker noted that she struggled with everyday stressors, would not follow through with verbal commitments to complete aspects of her case plan, and expressed confusion as to whether she had already completed the case plan. But by November 2021, Jocelyn appeared to be making more progress. At a case plan evaluation meeting, OCS noted that although Jocelyn continued to struggle with stress, she had agreed to complete several services and two assessments. Jocelyn proceeded to complete multiple healthy relationships courses as well as "Adverse Childhood Experiences" and "Raising Resilience" trainings.

In March 2022 OCS arranged for a clinical psychologist, Dr. Grace Long, to conduct a psychological evaluation of Jocelyn. Based on in-person evaluations and additional information provided by OCS, Dr. Long authored a written psychological assessment of Jocelyn in April 2022. Dr. Long assessed that Jocelyn was "in the borderline range of intellectual functioning" and, despite appearing to function well, "may or may not be following everything that's going on around her." Dr. Long noted that Jocelyn could recognize the importance of things such as medical attention, education, and sleep for Logan's well-being. However, Dr. Long noted that Jocelyn did not seem to apply this recognition to the facts surrounding Logan's removal by OCS. She found that "[Jocelyn] can identify and talk about positive parenting strategies but may not follow through on the implementation in a regular consistent manner." Dr. Long diagnosed Jocelyn with adjustment disorder with mixed anxiety and depressed mood; unspecified personality disorder; and borderline intellectual functioning.

Dr. Long provided three recommendations for Jocelyn. First, she recommended that Jocelyn receive a domestic violence assessment and related education, as Jocelyn seemed to show a casual attitude and tacit acceptance toward physical aggression. Second, Dr. Long stated that Jocelyn "could benefit from developing a trusting relationship with a case manager who could help her develop a

constellation of parenting skills and interpersonal practices." Third, Dr. Long recommended that Jocelyn attend Alcoholics Anonymous to learn how alcohol abuse impacts families.

OCS arranged for Jocelyn to receive a domestic violence assessment from Gette. Gette found Jocelyn to be extremely defensive of Jeremiah and expressed concern that Jocelyn might be a target of psychological control and manipulation. Using a clinical index, Gette scored Jocelyn in the low-risk range for stress, distress, morale, and resistance. But she scored Jocelyn in the problem range on the truthfulness scale.[2] Jocelyn reacted to these results with hostility, sending Gette insulting emails and texts that she interpreted as veiled threats.

At some point during Jocelyn's case, an unpaid advocate began accompanying Jocelyn to court appearances and case planning meetings. This advocate described herself as "helping [Jocelyn] to get through the system" and "associat[ing] with the family so that way there's somebody there that backs them up and helps to support them through the system." At an August 2022 hearing, the advocate told the court that she had been working with Jocelyn for about two years.

In January 2023 OCS petitioned to terminate Jeremiah's and Jocelyn's parental rights. According to the petition, Jeremiah had failed to complete much of his case plan, refused to address concerns about the risk of sexual abuse, and had recently been charged with possession of child pornography. As for Jocelyn, OCS alleged that despite completing much of her case plan, she remained insufficiently protective of Logan and continued to be in a romantic relationship with Jeremiah.

Shortly after a case plan evaluation meeting in May 2023, Jocelyn sent disturbing messages to the caseworker. Jocelyn stated that she would "kill people" if she lost Logan, would "take a murder charge for [Logan]," and expressed that if she

---

[2]     Jocelyn scored in the 88th percentile on this scale. Results at the 90th percentile would have invalidated the results due to untruthful responses.

"can't have him then nobody can."  This led the caseworker to cancel that week's visitation, prompting additional angry texts from Jocelyn.

**B.     Termination Trial and Order**

The superior court held a termination trial over multiple dates in April and June of 2024.  The court heard testimony from Dr. Long, Gette, OCS caseworkers, Jocelyn, Jocelyn's mother, and friends of the family.

The superior court issued a written order in December 2024, outlining its findings of fact and conclusions of law.  The court found by clear and convincing evidence that Logan was a child in need of aid due to risk of sexual abuse,[3] neglect,[4] and parental substance abuse.[5]  The superior court found that Jeremiah's continuing alcohol use and struggles with sobriety put Logan at risk.  Additionally, it found that Jeremiah had an extensive criminal history and was, at the time, charged with eight counts of possession of child pornography.  The court also credited Gette's observation that Jeremiah appeared to be "battling illegal sexual proclivities" and had little regard for the safety of women and children.

Additionally, the court found that Jocelyn's continued relationship with Jeremiah and lack of protectiveness for Logan put Logan at risk.  In reaching this conclusion, the court gave weight to Dr. Long's and Gette's evaluations of Jocelyn.  It credited Dr. Long's impressions that Jocelyn had troubling mental health indicators and borderline intellectual functioning.  And it credited Gette's observations that Jocelyn was unconcerned about criminal allegations against Jeremiah; in denial about Jeremiah's violence, abuse, and possible sex offenses; and not protective of Logan.

The superior court also found that the parents had failed to remedy OCS's concerns.  Although the court credited Jeremiah with completing several classes while

---

[3]     AS 47.10.011(7).

[4]     AS 47.10.011(9).

[5]     AS 47.10.011(10).

incarcerated, it found that Jeremiah failed to complete large portions of his case plan, such as the 36-week batterer intervention program recommended by Gette, or engage in any sex offender risk assessment.

As to Jocelyn, the court found that she had completed most of the tasks mandated in her case plan. Despite this progress, the court found that Jocelyn had failed to internalize the lessons her case plan was intended to help her learn. Noting Jocelyn's outbursts toward assessment providers and OCS workers, the court found she had failed to take her situation or OCS's concerns seriously. And the court faulted Jocelyn for continuing her romantic relationship with Jeremiah despite the risks he posed to Logan. Therefore, the court found that Jocelyn had not remedied OCS's concerns.

The superior court also found that OCS had fulfilled its statutory duty to make efforts to reunify the family.[6] The court credited the caseworker's testimony that he had met with the parents and explained the case plans and OCS's expectations numerous times, provided resources and referrals to complete recommended assessments and courses, and facilitated weekly visitation with Logan.

Finally, the superior court found that terminating Jeremiah and Jocelyn's parental rights was in Logan's best interests because neither Jeremiah nor Jocelyn had made sufficient behavioral changes or internalized their case plan lessons; Logan had been in OCS care for over four years; and Logan was doing well in the care of his foster parents, who had expressed willingness to adopt him. The court therefore terminated Jeremiah's and Jocelyn's parental rights.

Jeremiah and Jocelyn appeal.

---

[6] The court assessed OCS's efforts according to the "active efforts" standard mandated by the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1912(d), which does not apply to this case. The applicable standard under AS 47.10.086 requires "reasonable efforts," as we discuss in more detail below.

## III. STANDARD OF REVIEW

"Whether OCS made reasonable reunification efforts toward a family is a mixed question of law and fact."[7] We review the relevant factual findings for clear error; whether OCS's efforts are reasonable is ultimately a legal question we review de novo using our independent judgment.[8] Whether parents have remedied the conduct that caused a child to be in need of aid is a factual determination we review for clear error.[9] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[10]

## IV. DISCUSSION

### A. The Record Supports The Conclusion That OCS Made Reasonable Efforts To Reunify The Family.

The superior court may not terminate parental rights unless OCS "prove[s] by clear and convincing evidence that it made 'reasonable efforts' to provide family support services designed to prevent out-of-home placement or enable the safe return of the child to the family home."[11] "As part of these 'reasonable efforts,' OCS must identify, 'actively offer,' and refer the parent to family support services that will

---

**7** *Jimmy E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 529 P.3d 504, 513 (Alaska 2023) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 949 (Alaska 2013)).

**8** *Id.* (citing *Sherman B.*, 310 P.3d at 948-49).

**9** *Id.* at 512-13 (citing *Sherman B.*, 310 P.3d at 948-49).

**10** *Id.* at 513 (quoting *Sherman B.*, 310 P.3d at 949).

**11** *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1261 (Alaska 2010) (citing AS 47.10.086(a); AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A)).

assist him or her in remedying the conduct or conditions in the home that made the child a child in need of aid."[12]

OCS's efforts need not be perfect to be reasonable.[13] And we have recognized that OCS has "some discretion in determining what efforts to pursue and whether the timing is reasonable."[14] We do not focus on specific periods of OCS involvement with the family but instead consider its efforts "in light of the entire history of services . . . provided."[15] In considering reasonable efforts, "the primary consideration is the child's best interests."[16]

In this case, it is not entirely clear whether the superior court applied the "reasonable efforts" standard under Alaska law[17] or the "active efforts" standard required by federal law for cases involving an Indian child.[18] The decision's subheading and the first sentence of its analysis use the term "reasonable efforts." But the decision then shifts to using the term "active efforts," and the court's ultimate ruling uses that term as well. "Active efforts" is a more demanding standard,[19] rooted in the

---

[12]     *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 645 (Alaska 2013) (citing AS 47.10.086(a)).

[13]     *Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[14]     *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011).

[15]     *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003).

[16]     *Casey K.*, 311 P.3d at 645.

[17]     AS 47.10.086 (requiring OCS to make reasonable efforts in child-in-need-of-aid cases).

[18]     25 U.S.C. § 1912(d) (requiring "active efforts" to reunify family before termination of parental rights in cases governed by ICWA).

[19]     *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 901 n.13 (Alaska 2021) ("The superior court's termination order referred

tragic history that prompted Congress to enact ICWA.[20]  But the "active efforts" standard does not apply unless a child in OCS custody is an Indian child, which is not the case here.  We have repeatedly urged trial courts to heed this distinction,[21] and we do so again now.

Nevertheless, because the question of whether efforts are reasonable is ultimately a legal one, we may review the superior court's factual findings and decide

---

to both 'reasonable efforts' and 'active efforts.'  All cases involving Indian children are subject to ICWA's more stringent 'active efforts' requirement."); *Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006) ("[T]he 'active efforts' requirement of ICWA is more demanding than the 'reasonable efforts' requirement of AS 47.10.086."); *Casey K.*, 311 P.3d at 646-47 (explaining that active efforts standard in ICWA cases imposes higher burden on OCS than reasonable efforts standard).

[20]     When Congress enacted ICWA, it described the "wholesale separation of Indian children from their families [a]s perhaps the most tragic and destructive aspect of American Indian life today."  H.R. REP. NO. 95-1386, at 9 (1978).  In adopting regulations governing ICWA proceedings, the Bureau of Indian Affairs published commentary explaining that the active efforts requirement "is one of the primary tools" to remedy the frequent failure of state child welfare agencies "to recognize immediate, practical means to reduce the incidence of neglect or separation" among Indian families.  Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,813-14 (June 14, 2016).

[21]     *See, e.g.*, *Jada M. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 2025 WL 3472649 (Alaska Dec. 3, 2025) (urging courts "to pay close attention to this distinction" between "active" and "reasonable efforts"); *Betsy F. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 576 P.3d 647, 653 n.26 (Alaska 2025) ("We note, however, that given the substance of the argument before the superior court, it was peculiar for the court to refer to 'reasonable efforts' in a case controlled by ICWA."); *Clark J.*, 483 P.3d at 901 n.13 ("We take this opportunity, however, to emphasize that 'active efforts' to reunify the Indian family are required in every ICWA case and that courts may not substitute the lower 'reasonable efforts' requirement of non-ICWA cases."); *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 848 n.27 (Alaska 2009) ("[Counsel's] confusion is somewhat understandable, since the lower court cited to a decision concerning 'reasonable' efforts under Alaska statutes, not 'active' efforts under the ICWA.").

whether OCS's efforts were reasonable in this case. Given those findings, we conclude that OCS satisfied its duty to make reasonable efforts.

### 1. OCS's efforts for Jeremiah

In ruling that OCS's reunification efforts were sufficient, the superior court credited the testimony of the OCS social worker about the efforts he made for Jeremiah. These efforts included a referral for a substance abuse assessment, a domestic violence assessment, and a healthy relationships course. When Jeremiah's criminal case led to his referral to a different provider for a substance abuse assessment, the caseworker coordinated with the provider and Jeremiah's parole officer. OCS also referred Jeremiah for a domestic violence assessment with Gette. These referrals were responsive to the concerns OCS outlined in Jeremiah's case plan. And Jeremiah's caseworker evaluated his case plan progress several times over the course of the case, documenting those evaluations.

Notably, Jeremiah failed to complete several elements of his case plan. He did not complete a healthy relationships course. Nor did he complete the batterer intervention program recommended by Gette. Although Jeremiah made "satisfactory progress" during his time in an intensive outpatient program for substance abuse, he failed to complete that program because he went back to jail. And Jeremiah categorically refused to complete a sex offender risk assessment.

Jeremiah now challenges the sufficiency of OCS's efforts in several different respects. He argues that OCS failed to refer him to several services required by his case plan and did not timely refer him to other services. But OCS's failure to provide some referrals "need not be fatal" when OCS provides many others.[22] OCS's

---

[22] *Denny M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 365 P.3d 345, 351 n.22 (Alaska 2016).

efforts must be reasonable, not perfect.[23] The asserted deficiencies that Jeremiah claims do not, even when considered together, show that OCS failed to make reasonable efforts.

For example, Jeremiah argues that OCS delayed nearly five months in referring him to services after Logan was taken into custody. But according to the caseworker's testimony, which the superior court credited, this delay in making referrals was not an oversight. Rather, the caseworker testified that the five-month delay was to help the family, recently struggling with homelessness, to "get on their feet"; he did not want to overload them with tasks during that time. And the caseworker remained in active contact with the family in order to build rapport and overcome the parents' initial hesitation. This sufficiently explains OCS's lack of referrals while engaging with the family during this period. Again, OCS has "some discretion in determining what efforts to pursue and whether the timing is reasonable."[24] And because we consider OCS's efforts "in light of the entire history of services" it provides,[25] we have concluded in other cases that periods of inactivity during OCS's efforts do not necessarily undermine those efforts as a whole.[26]

Jeremiah also blames OCS for failing to surmount obstacles he faced in obtaining services, but many of those obstacles were ones he created. For example, OCS made an initial referral for a substance abuse assessment; when Jeremiah was later

---

[23] *Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[24] *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011).

[25] *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003).

[26] *See Roland L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 206 P.3d 453, 456-57 (Alaska 2009); *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002).

incarcerated, OCS coordinated with Jeremiah's parole officer and a different provider when a referral through the Alcohol Safety Action Program led Jeremiah to complete an assessment and begin treatment. Jeremiah faults OCS for not making another referral in September 2021, after he went back to jail again. Yet the caseworker testified that Jeremiah's substance abuse was monitored and controlled during his incarceration. The caseworker also described Jeremiah becoming more hesitant to engage with substance abuse programming after Gette's assessment in July 2021. Although it would have been better for OCS to continue making referrals despite Jeremiah's reluctance, we cannot say OCS failed to refer and actively offer him services to remedy his substance abuse issues.

Similarly, Jeremiah argues that OCS failed to refer him to additional mental health assessments after he declined a virtual assessment. OCS initially referred Jeremiah to Set Free for an integrated mental health/substance abuse assessment, but because Jeremiah was a registered sex offender, Set Free would not allow him on its campus and instead offered him services through video participation. He declined the services. "A parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide."[27] As with its efforts toward Jeremiah's alcohol abuse, it is fair to say that OCS could have done more to find an in-person mental health assessment for Jeremiah after he declined to avail himself of OCS's initial referral. But it was also reasonable, given Jeremiah's unwillingness to accept virtual services provided by Set Free, for OCS to focus on Jeremiah's substance abuse problem using providers with whom he was willing to work.

Jeremiah also faults OCS for not referring him to individual counseling or group counseling as suggested by Gette's assessment. But Gette's assessment prioritized sex offender treatment and a batterer intervention program. Indeed, Gette's

---

[27] *Sean B.*, 251 P.3d at 338.

report emphasized Jeremiah's propensity for "manipulation" and suggested that a group setting, rather than individual therapy, was essential for accountability. Given these recommendations, it was a reasonable exercise of OCS's "discretion in determining what efforts to pursue"[28] to emphasize the need for sex offender treatment and a batterer intervention program, rather than refer Jeremiah to unspecified individual or group therapy. Given the circumstances, the failure to make referrals for counseling is not fatal to a finding that OCS made reasonable efforts overall.

Finally, Jeremiah argues that OCS failed to adequately document its efforts on his behalf. OCS's duty to make reasonable efforts "includes the duty to . . . document [its] actions."[29] In the context of "active efforts," we have reasoned that documentation "is a mechanism for OCS and the court to ensure that [the required] efforts have been made."[30] Because the superior court cannot terminate parental rights without "clear and convincing" evidence that OCS made reasonable efforts, documentation of OCS's efforts is an important element of its statutory duty.

Jeremiah's argument that OCS failed to reasonably document its efforts is unpersuasive. Jeremiah asserts that OCS offered into evidence only two caseworker notes documented in OCS's electronic database (known as "ORCA"), but trial exhibit 27 contains numerous other entries documenting OCS's efforts. And although Jeremiah argues that OCS should update a parent's case plan each time a new provider is added, he does not cite any legal authority requiring this. Overall, the evidence shows that OCS did a reasonable job of documenting its efforts in this case.

---

[28] *Id.*

[29] AS 47.10.086(a)(3).

[30] *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019).

Considering OCS's efforts "in light of the entire history of services" it provided[31] and in light of the obstacles created by Jeremiah's own actions, we conclude that OCS made reasonable efforts to help Jeremiah reunify with Logan.

### 2. OCS's efforts for Jocelyn

OCS's efforts for Jocelyn included a referral to Alaska Youth & Family Network for a healthy relationships course and Alaska Family Services for a domestic violence victims' program. These referrals were responsive to Jocelyn's case plan goals "to maintain/cope with everyday stressors by establishing stability and positive routines through sobriety" and to "maintain[] healthy relationships that are free of domestic violence and put[] [Logan's] needs first." Jocelyn also completed a substance abuse assessment with Set Free, which found no evidence that she had current substance abuse problems and concluded that she did not meet the criteria for treatment. OCS evaluated Jocelyn's case plan progress several times and became more concerned about Jocelyn's life-coping skills than substance abuse as the case progressed. OCS also arranged for Jocelyn to receive a psychological evaluation from Dr. Long and a domestic violence assessment from Gette. The caseworker testified that he met with Jocelyn in a variety of settings and communicated with her by text and email.

The superior court found that Jocelyn completed most of her case plan steps. And at trial the court heard Jocelyn testify about what she had learned from the courses she had completed. But the court found that Jocelyn's case plan lessons had not made a "meaningful impact." It credited testimony that Jocelyn had mocked Gette after receiving her evaluation, sent threats to OCS when Logan's foster family planned to take him on vacation, and told a caseworker that she would "kill people" when her mother was denied placement of Logan. The court found that these incidents demonstrated that instead of "internaliz[ing] or tak[ing] seriously" OCS's concerns,

---

[31] *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003).

Jocelyn would become combative and noncooperative when confronted with the reality of her situation.

Jocelyn argues that OCS's efforts were unreasonable in light of her intellectual limitations, in part because OCS did not incorporate the results of her assessment by Dr. Long into its case strategy. She argues that it was unreasonable, in light of Dr. Long's assessment, for OCS to not specifically tell her to divorce Jeremiah if that was required to address OCS's concerns. Jocelyn argues that her case plan did not spell out how she could remedy OCS's concerns in a way that she, given her intellectual limitations, could understand or appreciate.

Jocelyn directs our attention to *Lucy J. v. State, Department of Health & Social Services, Office of Children's Services*.[32] *Lucy J.* applied the "active efforts" standard applicable to cases involving Indian children.[33] There we held that OCS must "reasonably tailor" its efforts to "the [parent's] individual capabilities."[34] We determined that OCS made active efforts for an intellectually disabled mother because OCS rewrote the mother's case plan to be more straightforward and highlight the most important elements, assisted the mother with basic needs such as stable housing, extensively communicated and provided one-on-one mentoring to the mother, and made recommendations related to her mental disability in all subsequent case plans.[35]

But the "reasonable efforts" standard does not require the same level of accommodation.[36] For example, in *Annette H. v. State, Department of Health & Social Services, Office of Children's Services*, we considered whether OCS's efforts were

---

[32]  244 P.3d 1099 (Alaska 2010).

[33]  *Id.*

[34]  *Id.* at 1116.

[35]  *Id.* at 1116-17.

[36]  *See Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006).

reasonable in light of the mother's anxiety disorder.[37] We held that OCS made reasonable efforts when it communicated with the mother through multiple means, found walk-in clinics because she struggled to keep advance appointments, accompanied her to appointments when she was uncomfortable, and offered new referrals when the mother was uncomfortable with providers.[38]

Here, although OCS's efforts may not have met the "active efforts" standard, they did meet the "reasonable efforts" standard. OCS's response to Jocelyn's limitations was similar to OCS's response to the mother's limitations in *Annette H*. The caseworker communicated with Jocelyn through multiple means, allowed her advocate and mother to attend meetings to help her understand her case plan, and focused on one area of concern at a time to avoid overwhelming Jocelyn. The caseworker's flexible accommodations in this case were reasonable efforts made "in a manner that takes a parent's [intellectual limitations] into account."[39]

In particular, allowing Jocelyn's mother and advocate to participate in case planning meetings was responsive to Dr. Long's recommendation that Jocelyn receive external support from someone she trusted. Additionally, Jocelyn's caseworker extensively communicated with her throughout the case and had difficult, personal discussions with her about what the case meant for her family. And when Jocelyn's caseworker was promoted, he sought to keep the case under his supervision because he was familiar with the family. These efforts at building trust and maintaining continuity were responsive to Dr. Long's suggestion that Jocelyn would benefit from developing a relationship with a trusted case manager.

---

[37] 450 P.3d 259, 267-68 (Alaska 2019).

[38] *Id.*

[39] *Lucy J.*, 244 P.3d at 1115.

Jocelyn likens her case to *Ronan F. v. State, Department of Family & Community Services, Office of Children's Services*,[40] but the comparison is inapt. In *Ronan F.*, an OCS caseworker insisted on meeting the father of two Indian children at his residence despite OCS's awareness that the father suffered PTSD, distrust, and paranoia.[41] In part because this insistence was "overly rigid," we held that the superior court erred in ruling that OCS had made active efforts.[42] But the active efforts standard does not apply in this case, and Jocelyn's caseworker was not nearly so rigid. Not only did he meet with Jocelyn in a variety of settings to accommodate the family, but he also allowed Jocelyn's advocate and mother to attend case planning meetings in what he testified was a "group effort."

Jocelyn also argues that, in light of her intellectual limitations, OCS should have provided her clearer directions to remedy its safety concerns, including telling her specifically to divorce Jeremiah. But OCS referred Jocelyn to classes that teach why substance abuse and domestic violence are dangerous to children, and Jocelyn's caseworker discussed OCS's concerns about Jeremiah with Jocelyn several times, including how those concerns affected reunification. It was reasonable for OCS to expect Jocelyn to internalize from these conversations and her parenting lessons that Jeremiah — with his unresolved substance abuse and domestic violence issues and pending child pornography charges — posed a danger to Logan. Jocelyn's failure to internalize these lessons does not, by itself, establish that OCS failed to reasonably tailor

---

[40]    539 P.3d 507 (Alaska 2023).

[41]    *Id.* at 509, 516.

[42]    *Id.* at 516.

its efforts to her needs and capabilities.[43] We therefore conclude that OCS made reasonable efforts to help Jocelyn reunify with Logan.

**B. The Superior Court Did Not Clearly Err In Finding That Jocelyn Failed To Remedy The Behaviors And Conditions That Placed Logan At Substantial Risk Of Harm.**

Jocelyn argues that the superior court clearly erred in finding that she failed to remedy the conduct and conditions that placed Logan at risk of harm. OCS's concerns were, in part, that Jocelyn did not make decisions that put Logan first and so would not put herself and Logan in an environment free from substance abuse and domestic violence. Yet Jocelyn does not actually argue that the superior court clearly erred by finding that her conduct still posed a risk of harm to Logan. Instead, she argues that she completed much of her case plan, so if completing the case plan was not enough to remedy OCS's concerns, its efforts could not reasonably be expected to result in reunification.

A parent must "remed[y] the problems that placed her children at risk and gain[] the necessary skills so that the children [can] be safely returned to her care."[44] Completing the steps assigned by OCS, which are intended to remedy the dangers the parent poses to the child, is not enough on its own to warrant reunification.[45] If a parent does not apply the case plan lessons to real life, then the parent has not fixed the problems that put the child at risk of harm. Jocelyn's inability to internalize her case plan lessons due to her intellectual limitations does not obviate OCS's safety concerns for Logan; if anything, the failure to do so reinforces those concerns.

---

[43] *See Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1259-62 (Alaska 2010) (affirming determination that OCS made reasonable efforts toward parent who completed case plan but failed to change behavior).

[44] *Id.* at 1260.

[45] *See id.*

We see no clear error in the superior court's finding that Jocelyn did not remedy the conditions that made it unsafe for her to have custody of Logan. Jocelyn stayed in a relationship with Jeremiah, and the superior court did not credit her testimony that she would leave him. "[I]t is the function of the trial court, not of this court, to judge the credibility of witnesses."[46] And Jocelyn does not argue that the court erred in finding that Jeremiah had not remedied the conditions that put Logan at risk — including substance abuse and domestic violence. Because Jeremiah's problems remained unremedied and Jocelyn remained with Jeremiah, the court did not err by finding that Jocelyn had not remedied the conditions that gave OCS concern for Logan's wellbeing.

## V. CONCLUSION

We AFFIRM the judgment terminating Jeremiah's and Jocelyn's parental rights.

---

[46] *Ronny M. v. Nanette H.*, 303 P.3d 392, 399 (Alaska 2013).